# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**ADM INTERNATIONAL SARL**

**VERSUS**

**RIVER VENTURES, LLC ET AL.**

CIVIL ACTION

NO. 18-3466

Reference: All Cases
SECTION "L" (3)

## ORDER & REASONS

Before the Court is Plaintiff's Motion in Limine to Exclude Proposed Testimony of Tom Stakelum Regarding the Navigation of Vessels. R. Doc. 103. The motion is opposed. R. Doc. 104. Plaintiff filed a reply. R. Doc. 109. The Court now rules as follows.

I.   **RELEVANT BACKGROUND**

Plaintiff ADM International SARL ("ADM") alleges that in March of 2018, the M/V HARVEST MOON, a ship owned and operated by ADM, was attempting to anchor when the M/V FREEDOM, a tug owned and operated by Defendant River Ventures, LLC ("River Ventures"), cut across the bow of the HARVEST MOON. R. Doc. 103-1 at 1. The FREEDOM was pushing crane barge RANDY W, a stevedoring barge owned and operated by Defendant Associated Marine Equipment, LLC ("Associated Marine"), and the FREEDOM was also using the assist tug M/V ST. ELMO, owned and operated by Defendant Marquette Transportation Company Gulf-Inland, LLC ("Marquette"), at the time of the collision. R. Doc. 1 at 2; R. Doc. 12 at 1; R. Doc. 103-1 at 2; R. Doc. 104 at 2. ADM further alleges that after the FREEDOM cut across the bow of the HARVEST MOON, the FREEDOM turned up into the current, stalled due to inadequate horsepower, and released the ST. ELMO. R. Doc. 103-1 at 2. ADM then contends the HARVEST MOON asked the FREEDOM to push ahead, but it could not because of

1

inadequate horsepower and failure to use its assist tug, and although the FREEDOM agreed to widen out to the opposite bank, it did not do so. R. Doc. 103-1. As a result of the collision, ADM alleges it sustained damages including physical repairs, loss of its starboard anchor, down time, tug expenses, pilot expenses, and other losses. R. Doc. 1 at 5. Accordingly, ADM brought suit against Defendants. R. Doc. 1.

River Ventures contests this description of events and the cause of the collision, arguing the HARVEST MOON failed to anchor at mile marker 137 of the Lower Mississippi River, almost struck a moored vessel, and "spun out of control into the middle of the river channel to collide with the M/V FREEDOM . . . and its tow, the C/B RANDY W." R. Doc. 104 at 1–2. River Ventures states the FREEDOM's assist tug, the ST. ELMO, was able to pull away in time to avoid the collision. R. Doc. 104 at 2. River Ventures further contends the "HARVEST MOON continued out of control and collided with a barge fleet on the opposite side of the river, owned by claimant, Ingram Barge Company ("Ingram"), who has sued to recover its damages from ADM." R. Doc. 104 at 2. Defendant Associated Marine also answered Plaintiff ADM's complaint, bringing a counterclaim against ADM. R. Doc. 15. Associated Marine alleges the collision and resulting damages sustained by Associated Marine were caused by HARVEST MOON's unseaworthiness and ADM's negligent operation of the vessel. R. Doc. 15 at 7–8. Defendant Marquette, meanwhile, was dismissed from this lawsuit. R. Docs. 84, 86.

## II.     PENDING MOTION

In this motion, Plaintiff ADM that the Court should exclude the proposed testimony of Tom Stakelum regarding the navigation of vessels. R. Doc. 103 at 1. Specifically, ADM contends Mr. Stakelum is not a navigation expert and lacks the qualifications to render opinions on the navigational decisions of the HARVEST MOON pilot. R. Doc. 103-1 at 2. In opposition,

Defendant River Ventures argues Mr. Stakelum qualifies as a marine expert and his testimony should be allowed at trial. R. Doc. 104 at 1. ADM filed a reply to River Ventures' opposition, stating that ADM "fully disputes that Mr. Stakelum is a marine expert in the area of navigation of vessels" and his opinions go far beyond the area of marine electronics and into opinions on navigational decisions that he is not qualified to offer. R. Doc. 109 at 1.

### III. LAW AND ANALYSIS

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. This rule codifies the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

The Court must act as a "gate-keeper" to ensure the proffered expert testimony is "both reliable and relevant." *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010). However, "[t]he primary purpose of the *Daubert* filter is to protect juries from being bamboozled by technical evidence of dubious merit." *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003). Accordingly, the Court's "gate-keeper" role is diminished in a bench trial because there is no need to protect the jury and risk tainting the trial by exposing the jury to unreliable evidence. *See Whitehouse Hotel Ltd. V. P'ship v. Comm'r*, 615 F.3d 321, 330 (5th Cir. 2010). Although the "gate-keeper" role may be diminished, the Court is still required to perform its gate-keeping function. *Metavante Corp. v. Emigrant Sav. Bank*, 2010 WL

3385961 (7th Cir. 2010).

The threshold question in determining whether an individual may offer expert testimony under Rule 702 is whether the individual is qualified to do so. Fed. R. Evid. 702. Apart from determining the qualifications of the expert, the Court's gate-keeping role also generally includes ensuring the proffered expert testimony is "both reliable and relevant." *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010). Because Plaintiff only contests that Mr. Stakelum lacks the qualifications to offer opinions on the navigation of vessels, the Court will focus on this argument.

### a. Whether Tom Stakelum is qualified to testify about the navigation of vessels

"A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999). An expert may not "go beyond the scope of his expertise in giving his opinion." *Goodman v. Harris Cty.*, 571 F.3d 388, 399 (5th Cir. 2009) (citing *First United Fin. Corp. v. U.S. Fid. & Guar. Co.*, 96 F.3d 135, 136 (5th Cir. 1996)). The party trying to introduce expert testimony must show by a preponderance of proof the "qualification of a person to be a witness." *Daubert*, 509 U.S. 579 at 601 n.10 (citing Fed. R. Evid. 104(a)).

ADM argues Mr. Stakelum offers several opinions regarding the navigational decisions of the HARVEST MOON's pilot that he is not qualified to provide. R. Doc. 103-1 at 2. Specifically, ADM contends the following five "Navigational Opinions" must be excluded:

> *Navigation Opinion 1-*To a vessel traveling through water, it makes little difference in so far as to actual ground speed whether the ship is travelling at 11.5 knots in the face of a 6.5 current or 5 knots in still water. The problem arises when the ship attempts to reduce to 0 knots ground speed in order to drop anchors while the water current is still at 6.5 knots. The vessel will have to hover over one spot while the current is attempting to deflect it to one side or the other. The Ship will have to make headway into the current at a rate that exactly offsets the opposing current, all the while battling swirling currents and up swells that can push it off of its heading. Neither Pilot Davisson nor Captain Raman

called for tug assistance prior to the collision to stabilize the heading of the ship during the first anchoring attempt that resulted in the Harvest Moon experiencing a fast-starboard turn. In the subsequent anchoring operations after the barge fleet collision, the vessel used two harbor tugs, one on each side of the bow.

*Navigation Opinion 2*-The vessel Harvest Moon entered Reserve Anchorage buts was unable to lower its ground speed or maintain minimal speed through the water or over the ground in order to complete anchoring in the designated anchorage area.

*Navigation Opinion 3*-The Harvest Moon chose to forego use of assist tugs during the initial anchoring attempt, despite facing into a 5-knot unstable current. As a result, the Harvest Moon was unable to maintain control of its heading or speed as it attempted to anchor. In two subsequent anchoring actions, two harbor tugs on the bow were used.

*Navigation Opinion 4*-Beginning at 23:20:34 the Pilot and Freedom exchanged voice traffic wherein the Freedom stated "Randy W, I'm trying to get over on the other side of that other ship", and at 23:21:05 the Pilot responded with "Okay" establishing a cross agreement.

*Navigation Opinion 5*-Just prior to dropping its port anchor and despite knowing that this action alone would cause a turn to starboard, the Harvest Moon sent its rudder to a hard starboard position for a full two minutes and eight seconds. Combined with dropping the port anchor, this magnified the starboard turning effect caused by the 6-knot water speed moving past the rudder.

R. Doc. 103-1 at 2–3. ADM argues Mr. Stakelum lacks the qualifications to offer opinions on the HARVEST MOON's ability to lower or maintain its speed, the pilot and master's choice to use tugs or not, what constitutes a passing agreement pursuant to United States Coast Guard Navigation Rules, and the effects of rudder position on the position of HARVEST MOON. R. Doc. 103-1 at 4. ADM states that while it has no problem with Mr. Stakelum providing expert testimony on his analysis of the vessel's VDR and other electronic sources, it does object to Mr. Stakelum "offering opinions on what HARVEST MOON was capable of, criticizing the navigational decisions of the master and pilot of HARVEST MOON, interpreting whether radio communications constitute legitimate navigational agreements, and the navigational effects on the choices of the master and pilot of HARVEST MOON." R. Doc. 103-1 at 4.

In opposition, River Ventures contends ADM's objections to each of the five opinions should be denied. First, River Ventures argues Opinion 1 is simply Mr. Stakelum's interpretation of HARVEST MOON's electronic data and not an opinion on what the master or pilot of the HARVEST MOON should have done. R. Doc. 104 at 6–7. Second, River Ventures asserts Mr. Stakelum's Opinion 2 is not an opinion on what the HARVEST MOON should have done, but rather, it is simply a factual statement of what occurred based on the electronic data. R. Doc. 104 at 7. Third, River Ventures explains Opinion 3 is simply a factual observation based on the available data and not an opinion on what the master or pilot should have done. R. Doc. 104 at 8. Fourth, River Ventures argues Opinion 4 should not be excluded because the statement is corroborated by the HARVEST MOON's recording as well as the FREEDOM's Captain in his deposition testimony, and the HARVEST MOON's pilot in his deposition. R. Doc. 104 at 9. Finally, River Ventures contends Opinion 5 should not be excluded because it is simply a statement of what occurred based on the electronic data and not a criticism of what the pilot had done. R. Doc. 104 at 10–11. River Ventures thus asserts ADM's objections to Tom Stakelum's opinions are unfounded and should not be excluded. R. Doc. 104 at 11.

In reply to River Ventures' opposition, ADM first disputes Mr. Stakelum is a marine expert in the navigation of vessels and also argues his opinions exceed his expertise in the area of marine electronics and ventures into questioning the navigational decisions of the pilot and master of the HARVEST MOON. R. Doc 109 at 1. With respect to Opinion 1, ADM again contends Mr. Stakelum is offering an opinion on what a ship must do in order to anchor at an anchorage and is implying that the ship was navigated poorly and should have called tugs, which do not fall within Mr. Stakelum's experience or training. R. Doc. 109 at 2–3. For Opinion 2, ADM states Mr. Stakelum is not simply taking information from the vessels' electronic data, but

instead, he is offering an opinion on how the ship was being navigated by stating that the ship was "unable" to do something. R. Doc. 109 at 3. For Opinion 3, ADM reiterates Mr. Stakelum is not only stating a fact, but he is questioning the navigational decisions of the pilot and master of the ship, which he is not qualified to do. R. Doc. 109 at 4. For Opinion 4, ADM again disputes the radio transcript is a crossing agreement and asserts Mr. Stakelum is not qualified to testify whether the communication is a crossing agreement pursuant to U.S. Coast Guard rules. R. Doc. 109 at 5. Finally, for opinion 5, ADM contends Mr. Stakelum does not have the experience or credentials that would qualify him to testify on how certain river forces and the pilot's actions could combine to have an impact on the HARVEST MOON. R. Doc. 109 at 6. ADM thus requests the Court grant its Motion in Limine to exclude the foregoing opinions.

The Court agrees with River Ventures that the testimony of Tom Stakelum as it relates to the five aforementioned "Navigation Opinions" should not be excluded. Mr. Stakelum is simply interpreting data and providing factual statements of observations of what occurred. Mr. Stakelum has the necessary qualifications to interpret this data and come to conclusions, which is what he has done. Any challenges to Mr. Stakelum's testimony are ripe for cross examination by ADM and affect only the weight of his opinion rather than its admissibility.

## IV. CONCLUSION

For the reasons stated above,

**IT IS ORDERED** that Plaintiff's Motion in Limine to Exclude Proposed Testimony of Tom Stakelum Regarding Navigation of Vessels, R. Doc. 103, is hereby **DENIED**.

New Orleans, Louisiana, this 14th day of November, 2019.

ELDON E. FALLON
U.S. DISTRICT COURT JUDGE