UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| ADM INTERNATIONAL SARL | CIVIL ACTION NO.: 2:18-cv-03466 |
|---|---|
| | c/w 18-8750 & 19-2451 |
| VERSUS | APPLIES TO: ALL CASES |
| | |
| RIVER VENTURES, L.L.C., | SECTION: L    DIVISION: 4 |
| ASSOCIATED MARINE EQUIPMENT, | |
| L.L.C., and MARQUETTE | JUDGE: FALLON |
| TRANSPORTATION COMPANY, LLC | |
| | MAGISTRATE: ROBY |

**ADM'S POST-TRIAL BRIEF**

Respectfully submitted,

SALLEY, HITE, MERCER & RESOR, LLC

*/s/ David M. Flotte*
David M. Flotte, T.A. (#1364)
Marcelle P. Mouledoux (#30339)
Kevin M. Frey (#35133)
365 Canal Street, Suite 1710
New Orleans, LA 70130
Tel.: (504) 566-8800
Fax: (504) 566-8828
dflotte@shrmlaw.com
mmouledoux@shrmlaw.com
kfrey@shmrlaw.com

*Attorneys for ADM International Sarl*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ ii

1. HARVEST MOON's Planned Approach to Anchor: ................................ 1

2. FREEDOM Interference with HARVEST MOON's Approach: ................... 4

3. FREEDOM Crossed HARVEST MOON In Anchorage, Not Above: ......... 6

4. FREEDOM Stalled in the Current and Promised to Widen Out: ............... 9

5. FREEDOM Did Not Widen Out and Blocked HARVEST MOON's
   Swing to the Center of the River: ................................................ 10

6. When Collision was Imminent, HARVEST MOON Went Astern to
   Save Lives: .......................................................................... 11

7. HARVEST MOON Dropped Starboard Anchor in Channel to
   Minimize Second Collision: ...................................................... 12

8. Starboard Anchor Lost Due to the Accident: ................................. 12

9. ST. ELMO was Not at Fault: ................................................... 13

10. ST. RITA had No Meaningful Information Regarding the Accident: ........ 13

11. HARVEST MOON is not at fault for lack of tug use .......................... 14

12. FREEDOM's Pre-Accident Problems: ......................................... 15

13. Towage Violations – 33 CFR §165.810(b)(3): ............................... 20

14. Company Policy – Violation of TSMS 7.9 and 33 CFR §83.34(g)
    Before Getting Underway: ...................................................... 21

15. Inland Rule 34(g) Violation – 33 CFR §83.34(g): ........................... 22

16. Additional Violations of Navigation Rules 34, 13, and 15: ................. 23

17. Violation of 33 CFR §83.18 (Navigation Rule 18): ......................... 25

18. Violation of 33 CFR §83.16 (Rule 16): ...................................... 26

19. Damages – Ingram, Gant, and Associated: .................................. 28

19. Damages – ADM: ............................................................... 29

21. Damages – Tug FREEDOM: .................................................... 37

22. No Limitation – TUG FREEDOM: ............................................. 39

22. Conclusion: ..................................................................... 41

# TABLE OF AUTHORITIES

**Cases**

Allied Chemical Corp. v. Hess Tankship Co. of Delaware, 661 F. 2d 1044 (5 Cir. 1981) .......... 27

Complaint of Hess Tankship Co., 526 F. Supp 1333 (E.D. La 1979) ......................................... 27

Delta Marine Drilling Company v. M/V BAROID RANGER, 454 F. 2d 128 (5 Cir. 1972 .. 33, 36

In re Bopco, L.P., 2013 U.S. Dist. LEXIS 128991 (E.D. La. 2013)...................................... 39, 41

In re Omega Protein, Inc., 548 F.2d 361, 371........................................................................ 39, 41

Trico Marine Assets v. Diamond B. Marine Servs., 332 F.3d 779 (5thCir. 2003)................ 39, 41

Union Oil Co. v. Tug MARY MALLOY, 414 F. 2d 669 (5 Cir. 1969) ................................ 22, 25

**Statutes**

33 CFR §110.195 ......................................................................................................................... 27, 28

33 CFR §165.810(b)(3).......................................................................... 20, 21, 26, 27, 39

33 CFR §83.03 ............................................................................................................................. 28

33 CFR §83.13 (Rule 13) .......................................................................... 24, 25, 26, 27

33 CFR §83.15 (Rule 15) .......................................................................... 24, 25, 26, 27

33 CFR §83.16 (Rule 16) ............................................................................................. 26, 27

33 CFR §83.18 (Rule 18) ..........................................................................24, 25, 26, 27

33 CFR §83.34 (Rule 34)............................................................... 21, 22, 23, 24, 27

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| ADM INTERNATIONAL SARL | CIVIL ACTION NO.: 2:18-cv-03466 |
|---|---|
| | c/w 18-8750 & 19-2451 |
| VERSUS | APPLIES TO: ALL CASES |
| | |
| RIVER VENTURES, L.L.C., | SECTION: L    DIVISION: 4 |
| ASSOCIATED MARINE EQUIPMENT, | |
| L.L.C., and MARQUETTE | JUDGE: FALLON |
| TRANSPORTATION COMPANY, LLC | |
| | MAGISTRATE: ROBY |

## ADM'S POST-TRIAL BRIEF

NOW INTO COURT, through undersigned counsel comes, ADM International SARL ("ADM") who provides the following Post-Trial Brief as requested by this Honorable Court. The evidence introduced at the trial have shown the following:

1.    **HARVEST MOON's Planned Approach to Anchor:**

NOBRA 70, Compulsory Pilot Joseph "Ted" Davisson, had 38 years of experience as a NOBRA Pilot anchoring over 1,500 ships in the Mississippi River between General Anchorage and Baton Rouge with no prior collisions. *See* Pilot Davisson Trial Testimony at p. 6, ln. 11-13; p. 9, ln. 9-15; and Exhibit AT-21, Pilot Davisson's Merchant Mariner Credential. The anchorages are similar, all are on straight reaches of the river rather than points and bends. He was familiar with all the anchorages including Reserve Anchorage where he anchored ships in the past. Pilot Davisson Trial Testimony at p. 8, ln. 2-25 to p. 9, ln. 1-8.

Pilot Davisson boarded HARVEST MOON near Bonnet Carré Anchorage (Mile 128 ahp) while underway about 1645 hours or two hours before anchoring. *See* Rec Doc. 113, Pre-Trial Order, at Uncontested Fact 38. Pilot Davisson had a routine exchange of information with the Master of HARVEST MOON, Capt. Raman, as well as fellow NOBRA Pilot David Rowbatham,

who was departing. *See* Exhibit AT-23, Pilot Rowbatham Pilot Card, at ADM-HM 003265-003266; Davisson Trial Testimony at p. 14, ln. 1-18 and p. 15, ln. 7-17; and Deposition of Capt. Raman (Exhibit RV-245) at p. 75, ln. 6-8. This exchange of information included the sharing of a pilot card showing maneuvering characteristics of the ship such as length, width, draft, time needed to go from full ahead to full astern, time needed for rudder to go hard over, etc. *See* Exhibit AT-23. The current was around five to six knots, so the heavily laden Panamax bulk carrier was sluggish to respond compared to the same ship in ballast with no current, which was normal. *See* Davisson Trial Testimony at p. 25, ln. 11-25. There were no issues with language barriers as the crew members on watch were Indian, with English as their native language. *See* Exhibit AT-17, HARVEST MOON IMO Crew List; and Deposition of Capt. Raman (Exhibit RV-245), p. 76, ln. 6-10.

Recordings from HARVEST MOON's Vessel Data Recorder ("VDR") confirmed the information exchange not otherwise documented was as follows: Just prior to 6:00 p.m. local time, Pilot Davisson alerted the Master, "Captain, we anchor in 30 minutes." *See* Exhibit AT-7, VDR Radar screenshots with annotations, at p. ADM-HM 003330; and Davisson Trial Testimony at p. 16, ln. 6-9. Chief Officer Prabhat Santosh was the duty officer on the bridge but he was relieved by The Third Officer so he could go to the forecastle during anchoring. *See* Deposition of Santosh (RV-247) at p. 8-9. There were no mechanical problems with HARVEST MOON as it approached Reserve Anchorage. *See* Deposition of Capt. Raman (Exhibit RV-245), p. 27, ln. 21 to p. 28, ln. 2.

At about 6:05 p.m. local time, the plan to drop port anchor and swing to starboard was agreed as follows, per VDR recording:

NOBRA 70: Captain, when we get into position, I would suggest we first let go port anchor with five in the water. Then we swing over to starboard with five in the water and then we will adjust.

The Master's response was "Proceed." *See* Exhibit AT-7 at ADM-HM 003331; and Davisson Trial Testimony at p. 16, ln. 15-23. This was significant because River Ventures' experts' thought that there was no plan to drop the port anchor and then swing to starboard to drop the starboard anchor. Tom Stakelum, the electronics expert for River Ventures, confirmed that was significant and he did not know the plan to swing to starboard until the trial because he only started listening to the part of the tape after 6:10 p.m. whereas the conversation regarding the plan to drop the port anchor and swing starboard took place 15 minutes earlier. *See* Stakelum Trial Testimony at p. 478, ln. 6-20. However, the Master, Pilot, Chief Officer Santosh, and even Capt. Peter Bordes, FREEDOM's captain, were all aware the ship was to swing to starboard after dropping port anchor. *See* Deposition of Capt. Raman (Exhibit RV-245) at p. 98, ln. 16-18; Deposition of Santosh (Exhibit RV-247) at. p. 84-86; and Capt. Bordes Trial Testimony at p. 137, ln. 13-18.

At about 6:06 p.m., Pilot Davisson broadcasted his intention on the radio to anchor at Reserve Anchorage, calling to traffic on the appointed traffic channel 67 stating:

NOBRA 70 is North-bound at the Reserve Anchorage. Unit 70. Reserve. We will be going into the Reserve Anchorage… Unit 70. NOBRA 70 will be stopping and dropping in the Reserve Anchorage.

*See* Exhibit AT-7 at ADM-HM 003332.  However, Capt. Bordes did not respond to the call for traffic because he did not hear it. *See* Capt. Bordes Trial Testimony at p. 122, ln. 17 to p. 123, ln. 25. He was then shifting Barge ART 35576 from Cargill. *See* Exhibit AT-89, FREEDOM Vessel Log, showing no involvement with RANDY W until 1810 hours or 6:10 p.m. Capt. Bordes could monitor only three VHF channels. *See* Capt. Bordes Trial Testimony at p. 123, ln. 22-23. He was monitoring channels 74 and 79 while facing up to RANDY W. *See* Capt. Bordes Trial Testimony

at p. 123, ln. 16-18. He was talking to his crew on Channel 21. *See* Capt. Bordes Trial Testimony at p. 123, ln. 19-21. He did not know that HARVEST MOON was coming into anchorage until he was already underway and TAK 1 alerted him to same. *See* Capt. Bordes Trial Testimony at p. 125-126. Capt. Bordes lacked situational awareness when getting underway after facing up.

Capt. Bordes held a Master of Towing License for three or four years. *See* Capt. Bordes Trial Testimony at p. 101, ln. 17-19. The most powerful tug he operated had 2,000 horsepower. *See* Capt. Bordes Trial Testimony at p. 102, ln. 8-12. Capt. Bordes is not a ship captain. *See* Capt. Bordes Trial Testimony at p. 102, ln. 4-5. However, he observed ships anchor in the past. *See* Capt. Bordes Trial Testimony at 9. 102, ln. 16-20.

Capt. Bordes was captain of FREEDOM, an old tug built in 1966. *See* Capt. Bordes Trial Testimony at p. 102, ln. 21 to p. 103, ln. 1. FREEDOM's two engines were rated at 600 horsepower each. *See* Capt. Bordes Trial Testimony at p. 102, ln. 8-12. It was the only tug in the CCI Fleet with no flanking rudders. *See* Capt. Bordes Trial Testimony at p. 103, ln. 9-14; and p. 103, ln. 23 to p. 104, ln. 8. It produced a wicked wheel-wash that would interfere with 90% of the other tugs getting behind it to push. *See* Capt. Bordes Trial Testimony at p. 110, ln. 10-20; p. 111, ln. 1-20.

## 2. __FREEDOM Interference with HARVEST MOON's Approach:__

As HARVEST MOON approached Reserve Anchorage, from 1810 to 1818 hours, Capt. Bordes and his crew made up FREEDOM to the stern of RANDY W, received its instructions, and was assigned assist tug, M/V ST. ELMO, from CCI. FREEDOM then got underway without sounding any horn/whistle and without calling for traffic. *See* Capt. Bordes Trial Testimony at p. 123-125; p. 127, ln. 8-10. Its destination was about 600 yards upriver to M/V OCEAN OPAL. After it left the west bank, FREEDOM traveled upriver for a minute and 51 seconds and then switched channels and called HARVEST MOON. *See* Capt. Bordes Trial Testimony at p. 125, ln.

19-25 to p. 126, ln 1-8; Tom Stakelum Trial Testimony at p. 465-466; and compare Exhibit AT-6, VDR/AIS Combined Transcript, showing call at 23:20:34, Exhibit AT-108, ECDIS Screenshot re: "unstable vector," and Stakelum Trial Testimony at p. 466, ln. 6-19, that FREEDOM was underway per ECDIS at 23:18:43.

After FREEDOM was underway for about a minute and a half, FREEDOM received a radio call from tug TAK 1 on an unrecorded channel who alerted FREEDOM's Capt. Bordes that HARVEST MOON was anchoring at Reserve Anchorage. *See* Capt. Bordes Trial Testimony at p. 125, ln. 19 to p. 126, ln. 8. Capt. Bordes then immediately switched to channel 67, called HARVEST MOON, during which the following was said:

| | |
|---|---|
| 23:20:34: | FREEDOM: FREEDOM to that HARVEST MOON |
| 23:20:42: | Pilot: Seven 0's on the HARVEST MOON |
| 23:20:46: | FREEDOM: Hey buddy you going coming into the anchorage right here pal? |
| 23:20:47: | Pilot: Well yeah |
| 23:20:52: | FREEDOM: You said you are sir? |
| 23:20:54: | Pilot: Yes sir I put it out on the air |
| 23:21:04: | FREEDOM: Alright (inaudible) RANDY W I'm trying to get over on the other side of that other ship |
| 23:21:05: | noise followed by Pilot saying "Okay |

*See* Rec. Doc. 113 at Uncontested Fact. When this first call to HARVEST MOON was made, the bow of HARVEST MOON was already in the lower end of the Reserve Anchorage and HARVEST MOON was already committed to the anchorage maneuver. *See* Capt. Bordes Trial Testimony, p. 129, ln. 20-22; Pilot Davisson Trial Testimony at p. 28, ln. 22-25 to p. 29, ln. 1-25; and Exhibit AT-100, MRTIS/ECDIS Screenshot marked "FTU," at 18:20:24.

During the call, Pilot Davisson confirmed to Capt. Bordes that he was in the process of anchoring in Reserve Anchorage. Bordes said he was going to the other side of the other ship, but never confirmed the path, whether he was to go above OCEAN OPAL or cross ahead or behind HARVEST MOON. *See* Capt. Bordes Trial Testimony, p. 131, ln. 20-22. He could have gone

below HARVEST MOON or above OCEAN OPAL. *See* Capt. Bordes Trial Testimony, p. 131, ln. 23 to p. 132, ln. 17. Importantly, at the time Capt. Bordes announced that he was going to the other side of the other ship, FREEDOM and its tow were off the port stern of HARVEST MOON. *See* Rec Doc. 113 at Uncontested Fact 42; and Exhibit AT-100. HARVEST MOON's bow was in the designated anchorage area at the time of the first radio call. *See* Capt. Bordes Trial Testimony at p. 129, ln. 20-22. The FREEDOM flotilla was outside the anchorage. *See* Capt. Bordes Trial Testimony at p. 131, ln. 6-7. Capt. Bordes' failure to clearly communicate his intentions as to his path means there was no crossing and/or overtaking agreement between HARVEST MOON and FREEDOM. He also blew no whistle signals as required by the U.S. Coast Guard ("USCG") Navigation Rules. *See* Capt. Bordes Trial Testimony, p. 132, ln. 25 to p. 134, ln. 1.

The Reserve Anchorage has space to anchor two Panamax ships. Pilot Davisson was headed for the upper spot. *See* Davisson Trial Testimony, p. 31, ln. 9-11. Pilot Davisson intended to drop the HARVEST MOON port anchor just inside the upper corner. He then intended to swing to starboard and drop the starboard anchor just outside the upper boundary but below the upriver end of the anchorage, though the body of HARVEST MOON would be within the anchorage once the anchoring process was complete. *See* Pilot Davisson Trial Testimony at p. 90, ln. 14-24. Thus, during the maneuver he could swing to the safety of the middle of the river as he swung to starboard. *See* Exhibit AT-97, Pilot Davisson regarding area where he intended to drop his anchors; and Davisson Trial Testimony at p. 21-22, p. 31, ln. 9-11, and p. 47, ln. 11-25.

### 3. <u>FREEDOM Crossed HARVEST MOON In Anchorage, Not Above</u>:

FREEDOM intended to travel along the west bank (right descending) near the barge fleet, go above the upriver end of the designated anchorage, then cross above the anchorage right by the starboard stern buoys of OCEAN OPAL, and then head upriver towards OCEAN OPAL. *See*

Exhibit AT-99, MRTIS screenshot with M/V FREEDOM intended route as drawn by Bordes; Bordes Trial Transcript at p. 118, lns. 9-25; Exhibit RV 257, MRTIS Screenshot with intended route as drawn by Tony Porche; and Tony Porche Trial Testimony at p. 409-411 and p. 429-430. Capt. Bordes swore that is the path they took, never crossing inside the designated anchorage. *See* Exhibit AT-100; RV-257; and Capt. Bordes Trial Testimony at p. 132, ln. 7-15. Instead, FREEDOM crossed the bow of HARVEST MOON well below the upriver end of the designated anchorage. *See* Exhibit AT-11, MRTIS Screenshot, at 18:29:10; and Exhibit RV-262, Track line for FREEDOM on Cunningham display. More importantly, if the actual tract line of HARVEST MOON from page 14 of the Cunningham report is compared side-by-side with the path that Capt. Bordes swore FREEDOM took then there would have been no collision at all. *See* Exhibits AT-99; and Exhibit AT-100.

The electronic data shows that the perception of Capt. Bordes was inaccurate because the flotilla did in fact cross through the upper 1/3 of the anchorage. Compare Exhibit AT-99 to Exhibit AT-11, MRTIS playback. His misstatement or bad estimate may not have been intentional. Instead, Capt. Bordes could not see where he was going because there was a big crane onboard RANDY W that blocked his forward vision. *See* Porche Trial Testimony at p. 410, ln. 1-7. Thus, he relied on his deckhand, Tony Porche, to be his lookout on the head of RANDY W. *See* Porche Trial Testimony at p. 408, ln. 1-9 and p. 410, ln. 1-15. Porche drew his intended path. *See* RV-257; and Porche Trial Testimony p. 409, ln. 19-20. Porche recalled something was different. When FREEDOM turned upriver, Porche recalled making fun of Capt. Bordes because FREEDOM was moving particularly slow when it turned upriver against the current that day. *See* Porche Trial Testimony at p. 437, ln. 19 to p. 439, ln. 5.

Because FREEDOM missed its intended path, crossed in the anchorage, and went into the heavier current, the flotilla speed over ground upriver was not as fast as it had been in the past. However, there were other factors that contributed to FREEDOM's slow speed. FREEDOM had two bent propellers and a bent starboard rudder. As to port, *see* Hanna Trial Testimony at p.163, ln. 20 to p. 164, ln. 20. As to starboard, *see* Smith Trial Transcript p. 639, ln. 23-25; p. 640, ln. 1-9; and Exhibits AT-77 through AT-80, Val's Diving Service, Inc. invoices. FREEDOM was full ahead on both engines from the time it got underway until the collision, but its speed over ground varied due to other factors. *See* Capt. Bordes Trial Testimony at p. 126, ln. 19-24; AT-74; AT-75.

HARVEST MOON reduced its speed to a minimum before dropping port anchor. *See* Deposition of Capt. Raman (RV-245) at p. 53, ln. 9 to p. 54 ln. 1-2. As HARVEST MOON attempted to line up to drop port anchor, FREEDOM overtook her and crossed her bow without blowing any whistles and without any agreement to do so. *See* Porche Trial Testimony at p. 422, ln. 23 to p. 423, ln. 5; and Rec. Doc. 113 at Uncontested Fact 44. As RANDY W crossed the head of HARVEST MOON, the ship went full ahead with some port rudder to support a steering change to port. *See* Pilot Davisson Trial Transcript at p. 43, ln. 9 to p. 44, ln. 19. HARVEST MOON went full ahead as it was preparing to drop port anchor because she had hardly any speed over ground and had five knots of current against her, so she had to maintain a certain amount of speed to maintain headway and not lose steerage. *See* Exhibit RV-245, Deposition of Capt. Raman (RV-245) at p. 135, ln. 14 to p. 136, ln. 1-10; and Kevin Highfield Trial Transcript at p. 190, ln. 5-14.

Chief Officer Santosh was on the forecastle when dropping anchors. *See* Deposition of Santosh Exhibit (RV-247) at p. 18, ln. 10-17. With him were an A/B and O/S. *See* Santosh Trial Testimony at p. 9, ln. 16 -25 to p. 10, ln. l-23. When given the order to prepare to drop anchors, he switched on the windlass motor, engaged the port gear clutch, removed the lashings, opened the

brake, and lowered both anchors until they were about 1.5 meters above the water and reset the brake. *See* Santosh Trial Testimony at p. 12, ln. 21-25 to p. 13. When the order was given by the Master to let go port anchor, Santosh commanded the AB to open the brake. *See* Santosh Trial Testimony at p. 17, ln. 14-23. There was no problem opening the brake. *See* Deposition of Santosh (RV-247) at p. 18 ln. 24-25 to p. 19, ln. 1-2.

FREEDOM interfered with HARVEST MOON's approach to the desired target spot to drop port anchor so, HARVEST MOON dropped the port anchor a little further from the west bank and a little lower in the designated anchorage area than placement would have occurred if FREEDOM had not been in the way. *See* Pilot Davisson Trial Transcript at p. 43, lns. 12-25 and p. 45, lns 9-14.

**4.    FREEDOM Stalled in the Current and Promised to Widen Out:**

After dropping port anchor, a conversation occurred starting at 23:32:35 VDR time, 18:34:08 USCG time, between Pilot Davisson and Capt. Bordes:

> Pilot: Seven-O to the FREEDOM or ST. ELMO
> FREEDOM:  Yeah come in for the FREEDOM
> Pilot: Yeah, we just dropped the port anchor, are you above me?
> FREEDOM: Yes sir I'm actually on the outside of you pushing a crane barge
> Pilot: Ok you're not the boat with the derrick?
> FREEDOM: Um yes, I've got the RANDY W that's correct.
> Pilot: Ok well I'm swinging out toward you. I would come ahead on that thing.
> FREEDOM: Dude I'm hooked up man.
> Pilot: (to 3rd Officer): Stop Engine.
> Third officer:  Stop engine.
> Pilot: Well, I would cross over then
> Third Officer: Engine is stopped.
> FREEDOM: Dude, I've got to go to the ship man.
> Pilot: Well Captain, do you want to get run over?
> FREEDOM: Not really but I mean… I'll widen out for you buddy…

*See* Exhibit AT-6, VHF Transcript. We now know FREEDOM was at full throttle the whole time, from the time she left the west bank fleet until the time of the accident. *See* Capt. Bordes Trial Testimony at p. 126, ln. 19-24.

Until the call after the turn upriver, Pilot Davisson did not know Capt. Bordes was full ahead while barely moving over ground. USCG AIS data shows FREEDOM's speed over ground pushing against the current when Capt. Bordes said "I'm hooked up man" was 0.7 knots (18:34:34 local time). *See* Exhibit AT-03, USCG AIS Playback. Summaries of the U.S. Coast Guard AIS display show the recorded speed over ground of FREEDOM during crossing when there was assistance of ST. ELMO was over three knots but once RANDY W and FREEDOM turned upriver against the current and ST. ELMO was no longer instructed to push, the speed over ground reduced to between 0.6 knots and 1 knot. *See* Exhibit AT-75, Summary of M/V FREEDOM Speed per AIS and Exhibit AT-03.

**5.**     **<u>FREEDOM Did Not Widen Out and Blocked HARVEST MOON's Swing to the Center of the River:</u>**

After the call where FREEDOM agreed to widen out, no objective evidence shows it widened out. *See* Exhibit AT-1, Rosepoint playback; Exhibit AT-4; and AT-11 MRTIS Playback. Capt. Bordes could have steered FREEDOM to the east bank. *See* Porche Trial Testimony at p. 439, ln. 11-12. HARVEST MOON continued to come ahead slowly to maintain steerage when FREEDOM agreed to widen out. FREEDOM controlled its assist tug, ST. ELMO, but chose not to use it during any of these maneuvers. Pilot Davisson lost confidence in FREEDOM after FREEDOM cut across his bow without notice. *See* Pilot Davisson Trial Testimony at p. 76, ln. 3-22. Pilot Davisson did not trust that Capt. Bordes would keep his word to widen out. Looking from Exhibit AT-7 at 23:33:14 when FREEDOM promises to widen out after he says he is above HARVEST MOON, to the collision, HARVEST MOON's escape route to fall to starboard is

blocked because FREEDOM's flotilla cannot maintain its speed. It is important to note that the icons in electronic data, AIS and Rosepoint, are the location of the transmitter, which is toward the bow of FREEDOM so, there is more vessel astern and more barge ahead in the full flotilla. *See* Exhibit AT-7.

For several minutes, not trusting FREEDOM and seeing the flotilla appeared to be stationary, Pilot Davisson, the Master, the Chief Officer, and the crew looked not just at available media but used direct line of sight from the forecastle to estimate the direction of travel during the swing as FREEDOM failed to make meaningful headway and widen out. At 23:34:10 VDR time, the Master reported to the pilot that the flotilla would not clear the swing to starboard so, at 23:34:12 and Pilot Davisson ordered "Full Astern" and "Hold port anchor." *See* Exhibit AT-6 at p. 12. At that time, HARVEST MOON was well-positioned in the designated anchorage area with its headline running through the starboard stern buoy of OCEAN OPAL. *See* Exhibit AT-7 at ADM-HM 003354-003355. HARVEST MOON could not safety deploy its starboard anchor because that would not stop the ship immediately and it would place an increased risk to crews aboard FREEDOM and RANDY W. *See* Pilot Davisson Trial Testimony at p. 47, ln. 2-7.

### 6. When Collision was Imminent, HARVEST MOON Went Astern to Save Lives:

When the Chief Officer received the command to "Hold port anchor," from the Master, he immediately told the A/B to tighten the brake and he saw the brake band stop the anchor chain from paying out. *See* Deposition of Santosh (RV-247) at p. 20, ln. 11-25 to p. 21. HARVEST MOON went astern to minimize damage to FREEDOM/RANDY W as well as any injuries to their crews. *See* Kevin Highfield Trial Testimony at p. 195, lns. 9-17; and Davisson Trial Transcript at p. 53, ln. 5-11. The port anchor held in the beginning but then it pulled out after. *See* Deposition of Raman (RV-245) at p. 135, ln. 14-25 to 136, ln. 1-10. Total physical damage to RANDY W,

which was where initial contact between the vessels was made, was limited to $1,300, all on the port side. *See* Rec. Doc. 113 at Uncontested Fact 1. Damage to FREEDOM was also minimal, $4,691.40. But, going astern to minimize damage caused HARVEST MOON to lose steerage with the current swinging the bow to starboard, leading to the bow hitting an east bank fleet. *See* Rec. Doc. 113 at Uncontested Fact 50.

**7.     HARVEST MOON Dropped Starboard Anchor in Channel to Minimize Second Collision:**

After FREEDOM cleared the starboard bow of HARVEST MOON, while the ship was moving astern, the Master ordered "let go starboard anchor." The anchor was dropped with no problem. *See* Deposition of Santosh (RV-247) at p. 26, ln. 2 to 25. When the starboard anchor was picked up after deployment to minimize the impact with the fleet, there was no problem picking it up, but when it was raised, it had concrete slabs and wires from the revetment. *See* Exhibit AT-33, Photograph of starboard anchor with revetment wires/slabs; and Deposition of Santosh (RV-247) at p. 34, ln. 6-25 to p. 35, lns. 1-23. The ship was moved to Reserve Anchorage with tug assistance where both anchors were re-deployed. While there was no problem letting both anchors go, when they picked up the starboard anchor after re-deployment, the starboard anchor was missing. *See* Deposition of Santosh (RV-247) at p. 39-41.

**8.     Starboard Anchor Lost Due to the Accident:**

The starboard anchor was lost because of its being fouled on the revetment due to the accident. *See* Deposition of James Boucher, NKK Class Surveyor (RV-254), at p 60, ln. 10-25 to p. 61, ln.1- 3; and Jason Fernandes Trial Testimony at p. 267-271. (*See infra* at this Post-Trial Brief at p. 39-41.)

**9.** **ST. ELMO was Not at Fault:**

ST. ELMO was assigned as an assist tug to work at the direction of FREEDOM's Capt. Bordes to shift RANDY W to OCEAN OPAL. *See* Deposition of Matthew Faulkner (RV-259) at p. 27, ln. 18 to p. 28, ln. 4. A second tug was required by CCI and Associated due to high river. *See* Deposition of Chad Gant at p. 215, ln. 18 to p. 216, ln. 4; and Capt. Bordes Trial Testimony at p. 108, ln. 25 to p. 109, ln. 1-9 and p. 112, ln. 6-8. Two tugs were needed to move RANDY W. *See* Capt. Bordes Trial Testimony at p. 108, ln. 13-17.

ST. ELMO as assist tug followed all orders and instructions of FREEDOM. *See* Capt. Bordes Trial Testimony at p. 112, ln. 6-8 and p. 114, ln. 23 to p. 115, ln. 14. FREEDOM controlled ST. ELMO. ST. ELMO assisted in pushing RANDY W across the anchorage but did not provide any further assistance with getting upriver after FREEDOM/RANDY W turned upriver into the current. *See* Capt. Bordes Trial Testimony at p. 136, ln. 1-21. ST. ELMO never put a line up to the tug or barge at any time. *See* Capt. Bordes Trial Testimony at p. 134, ln. 18-20. ST. ELMO was off the starboard side of FREEDOM when it agreed to widen out and never assisted FREEDOM with widening out. *See* Exhibit AT-1; and AT-11.

**10.** **ST. RITA had No Meaningful Information Regarding the Accident:**

Capt. Glynn Bonnet was the captain aboard ST. RITA, a nearby tug which was faced up to a wash dock on the west bank, when he heard a third-party radio talk about HARVEST MOON. *See* Bonnet Trial Testimony at p. 511-513 and p. 533-535. This was when he heard radio communication of "a ship coming out of the anchorage." *See* Bonnet Trial Testimony at p. 514, ln. 16-21. This is at 23:35:22 per VDR transcript. *See* Exhibit AT-6; and Bonnet Trial Testimony at p. 535, ln. 17 to p. 536, ln. 15. He looked up a couple of seconds before the collision with RANDY W. *See* Bonnet Trial Testimony at p. 536, ln. 9-15. He was alerted after the ship was

already astern. *See* Bonnet Trial Testimony at p. 536. He can contribute no factual information about events leading up to the initial impact as he was doing paperwork and not paying attention to anything around him until a couple seconds before the collision. His position allowed limited direct sight of FREEDOM because of the hull of HARVEST MOON. His observations are not as direct as the Facebook video which was put into evidence. He has no direct evidence of the radio communications. *See* Bonnet Trial Testimony at p. 518, ln. 18-21.

No starboard side damage was observed to FREEDOM by its crew, Faulkner nor Bonnet; *See* AT-116; and 30(b)(6) Deposition of River Ventures (Exhibit AT-116) p. 23-24. While the Cunningham replay implies that FREEDOM crashed into the east bank fleet and was crushed by HARVEST MOON, that simulation uses Google Earth barge positions rather than what was actually fleeted on the banks at the time, and objective evidence shows FREEDOM drove to the port side of HARVEST MOON well before the starboard bow hit the east bank fleet. *See* Exhibit AT-12, Facebook video; and AT-14, Facebook Video Screenshot.

## 11. **HARVEST MOON is not at fault for lack of tug use**:

In his report and testimony, River Ventures' navigation expert, Mr. Cunningham, questions Pilot Davisson's choice to not use tugs while anchoring at Reserve anchorage, noting that 6 of the last 12 vessels that entered Reserved anchorage used tugs. *See* Cunningham Trial Testimony at p. 689, ln. 2-11. Mr. Cunningham has never piloted or anchored a ship on the Mississippi River while Pilot Davisson has over 38 years of experiencing doing just that and has anchored over 1,500 vessels in the Mississippi River. *See* Cunningham Testimony at p. 655, ln. 15-23; and Davisson Testimony p. 6, ln. 11-13 and p. 8, ln.13 to p. 9, ln. 9. Pilot Davisson testified that it is the norm and custom that pilots not use tugs when going into an anchorage. *See* Davisson Trial Testimony

at p. 60, ln. 20-24. His experience vastly outweighs that of Mr. Cunningham and he would be the best judge of whether tugs are required or not to perform an anchorage.

Further, Mr. Cunningham's analysis of tug use of the last 12 vessels in Reserve Anchorage also ignores that fact that at least 3 of the vessels that utilized tugs were coming from upriver and had the flip the ship in order to anchor the vessel, a maneuver which always requires tugs. *See* Exhibit RV-133, Cunningham Report at p. 29-40. Additionally, Mr. Cunningham never explores other reasons why these vessels may have used tugs, such a Captain of the Port Order by the Coast Guard. The Coast Guard will often require vessel to utilize tugs while underway if the vessel is experiencing a mechanical issue, a situation which occurs frequently especially during high river. The fact that a few other vessels utilized tugs to go into the Reserve Anchorage has no bearing on the prudence of Pilot Davisson not using tugs as some of these vessels were coming from upriver and performing a completely different anchoring maneuver and other reasons for the use of tugs by these vessels were never investigated.

12. **FREEDOM's Pre-Accident Problems:**

FREEDOM was a twin-screw harbor tug built in 1966. *See* Capt. Larry Strouse Trial Testimony at p. 351. Its useful life expired before the day of the accident. *See* Smith Trial Testimony at p. 585. River Ventures hired Pat Folan to draft a manual and to try to get FREEDOM re-classified as an inspected towing vessel due to changes under Subchapter M of USCG. *See* Deposition of Folan (RV-251) at p. 39, ln. 13-25 to p. 40, ln. 1-16. The result was an 1,800-page manual approved by River Ventures' owner, Jerry Hanna, and in effect for two years before the accident. *See* Deposition of Folan at p. 95, ln. 3-9; Hanna Trial Testimony at p. 156, ln. 6-10; and Exhibit AT-85, River Ventures' Response to ADM Request for Production No. 33. FREEDOM

was not able to obtain USCG approval as an inspected vessel. *See* Deposition of Folan (RV-251) at p. 35-36.

FREEDOM marketed itself as having 1,350 horsepower but was only equipped with two 600 horsepower engines. Its expert naval architect never inspected the tug and did calculations based upon the assumption that the tug had more horsepower than the tug has for propulsion. *See* John Leary Trial Testimony at p. 558, ln. 4-17. This was the "coon ass horsepower" marketing efforts which include such things as the horsepower of the generators of the tug and machinery which does not translate to any power to move the tug ahead or astern. *See* Capt. Strouse Trial Testimony at p. 351-352.

Evidence relating to the condition of FREEDOM between 2017 and the day of the accident included the following:

The service of FREEDOM in the Mississippi River likely caused it to encounter floating logs and other issues that could cause damage to the propellers, rudders, and cutlass bearings, especially during high river periods; however, the tug was not drydocked between January of 2017 and the day of the accident, March 19, 2018. *See* Hanna Trial Testimony at p. 167, ln. 6-25 to p. 168, ln. 1-4; and Exhibit AT-88 at No. 23. Propellers cannot be removed or fixed without spending the money to drydock the tug. *See* Hanna Trial Testimony at p. 165, ln. 3-22; Exhibit AT-116; and 30(b)(6) Deposition of River Ventures (Exhibit AT-116) at p. 36, ln. 23-25 to 37, ln. 1.

On July 25, 2017, an invoice/report from Val's Diving disclosed to River Ventures "Port wheel has all 4 blades bent on tips, 3 to 4 inches," which was known to River Ventures and who elected to not drydock the tug for inspection or fix the port propeller. *See* Exhibit AT-78, Val's Diving Service, Inc. invoice dated 7/25/2017; and 30(b)(6) Deposition of River Ventures (Exhibit AT-116) at p. 36, ln. 9-22.

On September 26, 2017, Val's Diving conducted another inspection that showed "port wheel has all 4 blades bent on tips 4 to 6 inches," which was known to River Ventures who elected to not drydock the tug for inspection or fix the port propeller. *See* Exhibit AT-79, Val's Diving invoice dated 9/26/2017; and 30(b)(6) Deposition of River Ventures (Exhibit AT-116) at p. 35, ln. 20 to p. 36, ln. 6.

On October 10, 2017 Val's Diving conducted another inspection that showed "cutlass bearing on port shaft dropped back against the hub of the wheel. Wheel's the same condition as last time." *See* Exhibit AT-80, Val's Diving invoice dated 10/10/2017. River Ventures was aware of this report as evidenced by the signature of Daryl Allen of River Ventures, the customer. *See* Exhibit AT-80. River Ventures elected to not dry dock the tug for inspection or fix the propeller or cutlass bearing. *See* Hanna Trial Transcript at p. 167, ln. 6-25 to p. 168, ln. 1-4

On March 9, 2018, 10 days before the accident, Val's Diving did an inspection and found the "port wheel has all 4 blades bent on the tips, 4 to 6 inches, Starboard Rudder seems slightly bent to starboard." *See* Exhibit AT-77, Val's Diving invoice dated 3/9/2018. This was known to River Ventures as per customer signature on the invoice; Hanna Trial Testimony at p. 163-164; and 30(b)(6) Deposition of River Ventures (Exhibit AT-116) at p. 33. Ln. 17 to p. 35, ln. 18. River Ventures elected not to dry dock the tug or repair this prior to the accident. *See* Hanna Trial Transcript at p. 167, ln. 6-25 to p. 168, ln. 1-4. Capt. Bordes was not informed of the bend rudder. *See* Capt. Bordes Trial Testimony at p. 120, ln. 12-14.

River Ventures answered Request for Production No. 72, failing to disclose any of the Val's Diving reports in their answers given on August 23, 2019. *See* Exhibit AT-86, River Ventures' Response to ADM's Requests for Production No. 72. All of the Val's Diving inspections reports were obtained by ADM via subpoena to Val's Diving and when questioned during the

30(b)(6) Deposition of River Ventures about the failure to produce the report, River Ventures' owner/corporate representative, Jerry Hanna, said he was "sorry" because those were not produced. *See* 30(b)(6) Deposition of River Ventures (Exhibit AT-116) at p. 110, ln. 2-6.

The day before the accident, Capt. Danny Alario completed a near-miss report indicating that FREEDOM was unable to move a single 200-foot by 35-foot barge without an assist tug. This was new. The report was turned in to River Ventures who was aware of it. *See* Exhibit AT-81, River Ventures Safety Management Form 9.2 Near-miss Report dated 3-18-18; and Hanna Trial Testimony at p. 171. It is up to River Ventures to determine if the results of near-miss reports are shared with the captains. *See* Deposition of Folan at p. 79, ln. 7-22. In this instance, River Ventures never told Capt. Bordes about the near-miss report which recommended two tugs for moving a barge half the size of RANDY W. *See* Capt. Bordes Trial Testimony at p. 119, ln. 17-20; and Hanna Trial Testimony at p. 171, ln. 4-19. So, on the next day, the day of the accident, Capt. Bordes did not have that information. *See* Capt. Bordes Trial Testimony at p. 119, ln. 17-20.

Because FREEDOM was at full ahead from the time FREEDOM left the west bank fleet until the time of the first impact (*See* Capt. Bordes Trial Testimony at p. 126, ln. 16-24), the actual objective data shows that at full capacity FREEDOM was not able to maintain 1 knot over ground while pushing RANDY W per USCG AIS (*See* Exhibit AT-75; AT-26, AIS Screenshots with Annotations; and AT-3), per Rosepoint chart display (*See* Exhibit AT-74 and AT-1), and per USCG data from the FOIA Request of River Ventures. *See* Exhibit AT-111, at p. F24 to F27 (Annotated version).

The parties agreed to joint inspections of the vessels including FREEDOM effective March 20, 2018. *See* Exhibit AT-94, Letter from Jefferson R. Tillery to Anthony Rodriguez dated 3/20/2018. FREEDOM was drydocked three times since the accident. *See* 30(b)(6) Deposition of

River Ventures (Exhibit AT-116) at p. 6-12. ADM was never invited and never had the opportunity to see underwater damage. *See* Garreth Fernandes Trial Testimony at p. 181.

During the first drydocking, within the week of the accident, Kyle Smith and Jerry Hanna attended and the only photos taken were overall views from a crew member's Facebook post. *See* Exhibit AT-95, Photo of tug FREEDOM in drydock from Josh Miller's Facebook; and AT-96, Photo of tug FREEDOM in drydock from Josh Miller's Facebook. Although Mr. Smith attended and is shown in the photos, no photos were taken by him of the tug damage below the water line. No photos were produced in discovery nor at trial. *See* Smith Trial Testimony at p. 644, ln. 15 to p. 645, ln. 10.

The post-accident drydocking invoice of Belle Chasse Marine reflects the port wheel was removed and the port cutlass bearing was chocked for repair because it was "spinning in the housing." *See* Exhibit AT-93, Invoice from Belle Chasse Dry Dock, LLC dated 3/27/2018. This is the same cutlass bearing found to be faulty by Val's Diving in October of 2017 to have dropped back against the hub following vibration from bent tips since July of 2017. *See* Exhibit AT-78; and Exhibit AT-80.

ADM was allowed to inspect the port propeller at Jefferson Propeller which showed bends in the port propeller. *See* Exhibit AT-82, Photos of port propeller of FREEDOM. River Ventures claimed these were caused by FREEDOM's port propeller contacting the bulbous bow of HARVEST MOON and Jerry Hanna swore he wanted to recover costs to repair the propeller because these bends were serious and would cause a reduction in thrust of the tug pushing ahead. *See* 30(b)(6) Deposition of River Ventures (Exhibit AT-116) at p. 31. They were included in the damage claim because River Ventures' incorrect answer to Request for Admissions No. 21 stated that since 2017 "River Ventures had no problems with FREEDOM's propeller until they were

damaged by HARVEST MOON on March 19, 2018." *See* Exhibit AT-88, River Ventures Responses to ADM's Request for Admission No. 21. This is incorrect per Val's Diving's inspections. More importantly, the port propeller blades were bent forward when inspected by Garreth Fernandes which is inconsistent with the Facebook video (*See* Exhibit AT-12) and the trial testimony of Capt. Bordes which shows FREEDOM was driving ahead when it went across the bow of HARVEST MOON. Because FREEDOM was driving ahead over the bulbous bow, if there was contact, the port propeller blades would have been bent aft, not forward. *See* Garreth Fernandes Trial Testimony at p. 233. This goes not just to the issue of FREEDOM's damages but to the issue of its unseaworthiness, because the port propeller blades reduced the thrust that contributed to the collision.

Finally, Tony Porche's joking about Capt. Bordes going too slow when he turned upriver shows he realized the forward movement of the flotilla was abnormally slow. *See* Porche Trial Testimony at p. 413, ln. 22 to p. 414, ln. 3 and p. 437, ln. 19 to p. 439, ln. 9. Even if the tug was slow before, the near-miss report of FREEDOM's Capt. Alario from the day before the accident and the impression by Porche that Capt. Bordes was not running full ahead because they were going so slow are both independent objective common sense observations that FREEDOM was not making the same headway over ground that she had in the past.

## FACTS REGARDING VIOLATIONS

### 13.    Towage Violations – 33 CFR §165.810(b)(3):

The River Ventures company policy or "Towing Safety Management System" ("TSMS") requires River Ventures' captains to comply with 33 CFR §165.810(b)(3) which applies to Reserve Anchorage. That statute states: "towing in any formation by a vessel with insufficient power to permit ready maneuverability and safe handling is prohibited." *See* Exhibit AT-76, River Ventures

Safety Management System documents relating to the area of Algiers Point, included in the safety manual of River Ventures. The only rule of thumb in the River Ventures manual is on the next page which is the guide USCG gives for Algiers Point: is "Upbound speed over ground should be greater than or equal to three miles per hour (3 mph)." *See* Exhibit AT-76 at p. 1878; and Hanna Trial Testimony at p. 160, ln. 25 to p. 161, ln. 22. The FREEDOM flotilla did not include ST. ELMO when it turned upriver, which was the choice of Capt. Bordes. FREEDOM at full throttle was not able to even maintain 1 knot over ground with the tow as configured. *See* Exhibit AT-74; and Exhibit AT-75. Moreover, he agreed to widen out but did not do so reportedly because he went as far to the east bank as he could without losing control. He did not honor his agreement to go to the east bank because he wanted to go to port to the upper ship. *See* Capt. Bordes Trial Testimony at p. 139, ln. 10-19. His inability to widen out is a statutory violation that prevented ready maneuverability and safe handling. 33 CFR §165.810(b)(3). Capt. Bordes' Statement says he was heading to the east bank as fast as he can. *See* Exhibit AT-84. If that is true, his tow lacked maneuverability and safe handling because he never widened out at all. *See* Exhibit AT-1.

14. **Company Policy – Violation of TSMS 7.9 and 33 CFR §83.34(g) Before Getting Underway:**

Bordes, as captain of FREEDOM, was required to comply with the TSMS aboard FREEDOM. *See* Hanna Trial Testimony at p. 156; Exhibits AT-64, Functional Requirement Manual; AT-65, Compliance Manual; AT-66, 5.1 Safety Management Manual – Master's Responsibility; and AT-67, Safety Management Manual – Capt./Relief Capt. Responsibility. He was supposed to do a risk assessment. *See* Jerry Hanna Trial Transcript at p. 159, ln. 1-3; and Exhibit AT-68, 9.4(B) Risk Assessment Matrix. Specifically, he was supposed to undertake a navigation assessment "prior to getting underway." *See* Exhibit AT-71, River Ventures Safety

Management Manual 7.9 Navigation Watch Assessment Voyage Planning, Section 7.9.5. This includes the entire underway portion – "berth to berth" Section 7.9.4.

The fact he is only going 600 yards to OCEAN OPAL is no justification for failing to assess risks berth to berth. He should have complied with the requirements of "situational awareness," and considered "anticipated current and speed," "tow configuration," "horsepower," and "assist vessels," each set forth in Section 7.9.5. He should have considered "Whether the towing vessel has sufficient power to control the tow under all foreseeable circumstances." *See* Exhibit AT-71 at p. RV 936. Capt. Bordes did none of these. He had stop work authority. *See* Deposition of Folan (RV-251) at p. 57, ln. 17-18. He should have been aware HARVEST MOON was committed to anchorage before he left the west bank fleet, but he did not tune his radio to channel 67 until after he was underway and received a call from TAK 1, telling him of HARVEST MOON's intentions. *See* Capt. Bordes Trial Testimony at p. 123, ln. 5 to p. 124, ln. 25. He should have waited just like tug MARY MALLOY in another case where a tug/tow should have held up instead of taking a parallel path alongside a deep draft ship. *Union Oil Co. v. Tug MARY MALLOY*, 414 F. 2d 669 (5 Cir. 1969). In *MARY MALLOY*, there was a custom for the tug entering Neches River from the Intracoastal to wait, resulting in 100% fault as a flotilla ran side-by-side with a deep draft ship.

### 15. <u>Inland Rule 34(g) Violation – 33 CFR §83.34(g):</u>

There was a series of errors and violations that led to the collision. FREEDOM violated 33 CFR §83.34(g) (Rule 34) which provides:

> (g) When a power-driven vessel is leaving a dock or berth, she shall sound one prolonged blast.

This was violated as admitted by Capt. Bordes. *See* Capt. Bordes Trial Testimony at p. 126, ln. 14 to p. 127, ln. 10. Capt. Bordes neither sounded a blast nor called for traffic on the VHF radio before getting underway. FREEDOM had electronic charting where she could identify HARVEST

MOON and could have called her. FREEDOM traveled for about a minute and a half to two minutes before even calling HARVEST MOON and only switched to channel 67 when TAK 1 called FREEDOM to warn FREEDOM a deep draft ship was coming into the anchorage. *See* Capt. Bordes Trial Testimony at p. 124, ln. 1 to p. 125, ln. 25. See Cunningham Trial Testimony at p. 700, ln. 9-16. The time is important because by then, HARVEST MOON was committed to anchoring and its bow was entering the designated anchorage. *See* Capt. Bordes Trial Testimony at p. 129, ln. 20-22.

16. **Additional Violations of Navigation Rules 34, 13, and 15:**

FREEDOM overtook HARVEST MOON and crossed her bow. *See* Rec. Doc. 113 at Uncontested Fact 44. Capt. Bordes blew no horns which are USCG violations of 33 CFR §83.34(a) and (c). *See* Capt. Bordes Trial Testimony at p. 132, ln. 9 to p. 133, ln. 25. He claims he had an agreement to overtake and cross. *See* Capt. Bordes Trial Testimony at p. 131, ln. 14-19. However, his claim of a VHF overtaking agreement is the radio exchange where FREEDOM only said "I am trying to get over on the other side of that other ship." *See* Exhibit AT-6 at p. 2 at 232104; and Rec. Doc. 113 at Uncontested Fact 43. Those words are not sufficiently specific to designate a path. *See* Capt. Bordes Trial Testimony at p. 131, ln. 20 to p. 132, ln. 15. At the time, FREEDOM was off the port stern of HARVEST MOON. *See* Exhibit AT-7 at ADM-HM 003340. Thus, no proper agreement was ever reached via VHF.

When coming up the west bank fleet on a parallel course to HARVEST MOON, FREEDOM violated Rule 34, 33 CFR §83.34(c), which says:

"(c)When in sight of one another, (i) a power driven vessel intending to overtake another power driven vessel shall indicate her intention by the following signals on her whistle:…

…(2)Two short blasts to mean "I intend to overtake you on your port side".

FREEDOM blew no whistles in violation of 33 CFR §83.13. *See* Capt. Bordes Trial Testimony at p. 132, ln. 25 to p. 133, ln. 2.

FREEDOM then violated 33 CFR §83.13 (Rule 13) which says:

(a) Notwithstanding anything contained in rules 4 though 18 (Sections 83.04 through 83.18) any vessel overtaking any other shall keep out of the way of the vessel being overtaken.

FREEDOM and RANDY W angled out into the anchorage area to go around barges. *See* Porche Trial Testimony at p. 408, ln. 11; and Exhibit AT-11 at 181942 to 182414. FREEDOM moved back toward the west bank, initially, running parallel to HARVEST MOON. Then, FREEDOM cut across the path of HARVEST MOON in violation of 33 CFR §83.34 (Rule 34) which provides:

"When power driven vessels are in sight of one another and meeting or <u>crossing at a distance of within half a mile</u> of each other, each vessel underway when maneuvering as authorized by these Rules:

(i)     Shall indicate that maneuver by the following signals on her whistle: …

(2)     <u>Two short blasts mean "I intend to leave you on my starboard side."</u> (emphasis added)

FREEDOM/RANDY W were between 250 feet and 300 feet of HARVEST MOON's absolute bow when crossing, not just in the danger zone of a half mile but within less than one flotilla length and less than a half ship length. *See* Capt. Bordes Trial Testimony at p. 133, ln. 22-25. No radio communication warned of this violation. This was a violation of not just Rule 34 but Rule 15, which required FREEDOM to cross behind HARVEST MOON.

In that regard, 33 CFR §83.15 (Rule 15) provides

(a)     When two power-driven vessels are crossing so as to involve the risk of collision, the vessel which has the other on her starboard side **shall keep out of the way** and **shall, if the circumstances of the case admit, avoid crossing ahead of the other vessel.**

(b)     Notwithstanding paragraph (a) of this Rule, on the Great lakes, Western Rivers, or water specified by the Secretary, a power-driven vessel crossed a river shall keep out of the way of a power-driven vessel ascending or descending the river." (emphasis added.)

Circumstances permitted FREEDOM to cross behind HARVEST MOON. *See* Capt. Bordes Trial Testimony at p. 131, ln. 25 to p. 132, ln. 6. FREEDOM/RANDY W/ST. ELMO should never have crossed 250 feet to 300 feet in front of HARVEST MOON in the anchorage. The flotilla had a duty to stay clear. Rule 13 and Rule 15. By cutting in front, it interfered with the approach of HARVEST MOON and prevented it from dropping its port anchor where it wanted. FREEDOM's interference with HARVEST MOON was a lot worse than tug MARY MALLOY. 414 F. 2d 669 (5 Cir. 1969). HARVEST MOON turned to port and had to come full ahead to maintain steerage before swinging to starboard to get a proper spread on her anchors. Capt. Bordes knew from the first call that HARVEST MOON was a loaded deep draft ship that had to get a spread on its anchors based upon what Capt. Bordes observed in the past (even though he is not a ship captain). Capt. Bordes admitted in his deposition and his recollection was refreshed that at the time he knew HARVEST MOON was restricted in its ability to maneuver. *See* Capt. Bordes Trial Testimony at p. 153., ln. 4-20. He knew the ship had to swing to starboard after dropping the port anchor. *See* Capt. Bordes Trial Testimony at p. 136, ln. 23 to p. 137, ln. 18. He should have crossed behind HARVEST MOON or crossed above the anchorage. *See* Exhibit AT-100. Rule 15 required him to blow two whistles, wait, and then cross behind HARVEST MOON. Instead, FREEDOM went into the fast water, called off its assist tug, turned upriver, and stalled.

**17.     Violation of 33 CFR §83.18 (Navigation Rule 18):**

When HARVEST MOON deployed its port anchor and called for FREEDOM to push upriver or widen out, FREEDOM should have honored the agreement to widen out. But FREEDOM breached that agreement. *See* Capt. Bordes Trial Testimony at p. 139, ln. 12-20.

FREEDOM had a duty to get clear and stay clear, not just of the crossing but of the anchoring maneuver. In that regard, 33 CFR §83.18 (Rule 18) provides:

Except where Rules 9, 10, and 13 (Sections 83.09, 83.10 and 83.13) otherwise require:

(a) A power-driven vessel underway shall keep out of the way of

(ii) A Vessel restricted in her ability to maneuver…

Here, there is no conflict. Rule 13, Rule 15, and Rule 18 all require FREEDOM to stay clear of HARVEST MOON when committed to the anchoring maneuver including the known swing to starboard acknowledged by Capt. Bordes. Capt. Bordes was aware HARVEST MOON was restricted in her ability to maneuver. *See* Capt. Bordes Trial Testimony at p. 153, ln. 4-20.

Capt. Bordes claimed he widened out. Instead, his icon became closer to the west bank which at the very least means some part of his tow closed on the HARVEST MOON. *See* Exhibit AT-1.

**18.** **Violation of 33 CFR §83.16 (Rule 16):**

FREEDOM violated 33 CFR §83.16 which provides:

Every vessel which is directed to keep out of the way of another vessel shall, so far as possible take <u>early</u> and <u>substantial action</u> to keep well clear. (emphasis added.)

As mentioned above, FREEDOM said "I'll widen out for you," promising to go toward the east bank. FREEDOM never took early action. FREEDOM never took substantial action to widen out. He claims he could not do so because of issues with current. If he was as close as he could get to the east bank due to mechanical issues with his tug or his skill and failure to use his assist tug during the two minutes leading up to the accident, then he violated the towing statute 33 CFR §165.810(b)(3) which requires:

…**"towing in any formation with a vessel with insufficient power to permit ready maneuverability and safe handling is prohibited…"** (emphasis added.)

In summary, FREEDOM had statutory violations triggering the Pennsylvania Rule which led to the collision:

- 33 CFR §83.34(a), (c), (g), Rule 34;

- 33 CFR §83.13, Rule 13;

- 33 CFR §83.15, Rule 15;

- 33 CFR §83.18, Rule 18;

- 33 CFR §83.16, Rule 16; and

- 33 CFR §165.810(b)(3), (sufficient power and maneuverability for safe handling).

<u>HARVEST MOON Violated No Rules</u>:

River Ventures has argued that HARVEST MOON should not have planned to drop its port anchor outside of the designated anchorage area, claiming that is a violation of 33 CFR §110.195. HARVEST MOON dropped its port anchor in the anchorage. HARVEST MOON dropped its starboard anchor after the collision with FREEDOM/RANDY W.

HARVEST MOON was underway, not at anchor, so the statute does not apply. *Complaint of Hess Tankship Co.*, 526 F. Supp 1333 (E.D. La 1979); Affirmed by *Allied Chemical Corp. v. Hess Tankship Co. of Delaware*, 661 F. 2d 1044 (5 Cir. 1981). In *Hess*, SOCRATES, a tow was pushed into the bank when another vessel, HESS REFINER, ran into it. *Hess* claimed the same statute was violated. The court held that SOCRATES was underway because her engines were in gear and she was pushing her tow into the bank so 33 CFR §110.195(c) did not apply. Similarly, the uncontradicted evidence is HARVEST MOON was maneuvering using her engines, underway, and making way over ground the whole time. On this point, Pilot Davisson testified he was underway the whole time. *See* Pilot Davisson Trial Testimony at p. 59, ln. 3-8.

Underway means that a vessel is "not at anchor or made fast to the shore or ground." 33 CFR §83.03(i). Pilot Davisson testified he uses areas adjoining the anchorage to maneuver in all of the 1,500 ships he anchored prior to the accident. This one was no different. *See* Pilot Davisson Trial Testimony at p. 22, p. 26, p. 90, ln. 14-24 and p. 92, ln. 11-19; and Exhibit AT-97. Cunningham included in his report plots of ships approaching Reserve Anchorage. His own evidence confirms use of adjoining areas to maneuver into position. HARVEST MOON was not at anchor so, 33 CFR §110.195(c) is not applicable to the collision with FREEDOM/RANDY W.

After the first collision with RANDY W and FREEDOM and before running head-on into the east bank fleet, HARVEST MOON dropped the starboard anchor. This was done to minimize the impact of the second collision. *See* Deposition of Raman (RV-245) at p. 321-322; and Pilot Davisson Trial Testimony at p. 57, ln. 1-19. HARVEST MOON was not stopping for the night. It shifted back to anchorage after its momentum was stopped. This is not a violation of the anchorage statute because the prohibition on anchoring outside of established anchorages in the Mississippi River is not applicable "in cases of emergency." 33 CFR §110.195(c)(1).

The evidence shows River Ventures/FREEDOM was solely at fault and caused the collision. The evidence shows HARVEST MOON was free from fault.

**19.** **Damages – Ingram, Gant, and Associated:**

The parties have stipulated the following damages are recoverable and should be included in any judgment:

- Ingram Barge: $189,872.80 inclusive of prejudgment interest and costs. *See* Rec. Doc. 113 at Uncontested Fact 2.

- Chad Gant: $345,000 inclusive of pre-judgment interest and costs. *See* Rec. Doc. 113 at Uncontested Fact 4.

- Associated Marine Equipment, LLC: $73,022.70 inclusive of pre-judgment interest and costs. *See* Record Doc. 123, Order granting Motion to amend Pre-Trial Order.

Thus, the Court's assessment of damages is limited to the damages recoverable by ADM and the damages recoverable by River Ventures as a consequence of the accident in question.

19.    **Damages – ADM:**

ADM claims damages of $ $939,026.34. *See* Exhibit AT-106, Damage Claim Summary.

ADM it lost its starboard anchor due to the accident. *See* Deposition of Boucher (RV-254) at p. 60-61. The HARVEST MOON captain, pilot, and crew went full astern to mitigate the impact of the collision with FREEDOM two seconds after the Master reported from lookout FREEDOM was not clear. *See* Exhibit AT-6 at p. 12. RANDY W was a crane barge which had nine men aboard who were at risk of serious injury of death as FREEDOM breached its promise to widen out. *See* Rec. Doc. 113 at Uncontested Fact 17; and Porche Trial Testimony at p. 409, ln. 21-25. HARVEST MOON acted prudently and exercised good seamanship in going full astern at 23:34:12 which in fact mitigated the physical damage to RANDY W to $1,300. *See* Pilot Davisson Trial Testimony at p. 53, ln. 5-11; and Rec. Doc. 113 at Uncontested Fact 1.

Pilot Davisson deployed the starboard anchor only after FREEDOM cleared the starboard bow because before then, dropping the anchor could risk damage and injury to FREEDOM. *See* Pilot Davisson Trial Testimony at p. 54, ln. 2-9; and Exhibit AT-12. The starboard anchor was dropped on an emergency basis after the first collision but before the bow of HARVEST MOON hit the east bank barge fleet to minimize the damage to the fleet and ship.

The anchor connection to the chain broke at the D-link. *See* Jason Fernandes Trial Testimony at p. 276, ln. 24 to p. 277, ln. 20; Exhibit AT-58, Photograph of shackle swivel; Smith Trial Testimony at p. 623, ln. 15-18; Jason Fernandes Trial Testimony at 278-279; and Deposition

of Boucher at p. 60-61. When being dragged 1,200 feet from the middle of the river to the east bank, the starboard anchors' D-link attached to the end of the anchor shank likely struck the same revetment shown in photographs taken by the ship's crew when the starboard anchor was raised minutes after the ship's momentum was stopped by the anchor and east bank fleet. *See* Jason Fernandes Trial Testimony at p. 265-266, 270, 276-277; Rec. Doc. 113 at Uncontested Fact 46, 47, 49, 50, 51, 52, 54, and 55; and Exhibit AT-33.

River Ventures denies that the collision caused the loss of the starboard anchor. River Ventures argues that after the accident, six common links on the port anchor chain were found to be worn by NKK Class Surveyor James Boucher and that a similar weakness likely was present on the starboard links and at the port and starboard swivels were backwards and that the loss of the starboard anchor was due to these deficiencies. The loss of the starboard anchor was not due to six weak common links or a mis-aligned swivel. First, the testimony of Mr. Boucher was that the starboard anchor likely was lost due to being fouled on the revetment during the accident. *See* Deposition of Boucher (RV-254) at p. 60-61. Next, Boucher testified that the alignment of the swivel made no difference in the loss of the starboard anchor. *See* Deposition of Boucher (RV-254) at p. 59, ln. 24 to p. 60, ln. 25. Further, the D-link failed, not the common links or swivel. The arrangement plan shows the D-link is connected to the shank and there was no evidence the D-link was worn on port or starboard anchors. *See* Exhibit AT-57, Arrangement of Chain Cable. The links found to be worn on the port side did not fail nor did corresponding links on the starboard side because the chain broke at the last link before the shank, not at the swivel, which is still intact. *See* Exhibit AT-57; and Exhibit AT-58, photo of starboard links post-accident showing swivel and common links still intact. The ClassNK Survey Report, specifically identifies the worn links as "six common links between Kenter and Swivel." *See* Exhibit AT-19, ClassNK Survey Reports

dated 3/20/18, 3/24/18, and 3/25/18, at p. 4. The arrangements show the D-link connects the anchor shank to an end link that is connected to the swivel that is connected to the group of six common links. *See* Exhibit AT-57. In summary, the D-link failed, and the starboard anchor was lost due to the emergency deployment to mitigate damage from the accident.

River Ventures claims that the bulk of its damages were caused due to the failure of the windlass port gear which was broken when the ship was at Magnolia Anchorage before the accident. The gear was fixed and worked several times but failed the day after the accident. The windlass gear broke at Magnolia Anchorage on March 14, 2018 at about 1330 hours. *See* Rec. Doc. 113 at Uncontested Fact 27. It was repaired by Buck Kreihs on March 14 and 15, 2018 by welding. *See* Rec. Doc. 113 at Uncontested Fact 28. The repair was temporary with a plan by ADM to replace the gear with a new one when cargo was discharged. *See* Rec. Doc. 113 at Undisputed Facts 30 and 35. After repair at Buck Kreihs and installation, the windlass gear was tested and used five more times. *See* Jason Fernandes Trial Testimony at p. 290, ln. 8 to p. 293, ln. 16.

The NKK Class surveyor was not notified of the windlass gear failure at Magnolia Anchorage, but if he were notified, he would take certain steps: make sure an experienced and capable contractor such as Buck Kreihs was engaged for repairs and after repair, test the anchor windlass gear by raising and lowering the anchor before the ship sailed. *See* Deposition of Boucher (RV-254) at p. 65-66. Those same steps were done by ADM. *See* Jason Fernandes Trial Testimony at p. 290, ln. 8-23. If those steps were done and a plan was made to replace the gear after cargo was discharged, then NKK would have approved the temporary repair, placing a condition of class to install the replacement gear upon discharge. *See* Deposition of Boucher (RV-254) at p. 65-66.

Due to the accident on March 19, 2018, HARVEST MOON was anchored on March 20, 2018 using a single anchor whereas two anchors were always used when anchoring in the

Mississippi River. *See* Fernandes Trial Testimony at p. 294, ln. 11-14. The effect of the current on the hull of the ship loaded with a single anchor caused the ship's weight to pull the anchor deeper below the riverbed than if the normal two anchors were used. But HARVEST MOON could not use two anchors because its starboard anchor was lost from the accident. The normal anchor windlass is strong enough to lift the weight of the anchor and chain but when the port anchor was pulled deeper below the river bed due to the accident, an increased strain led to the failure of the temporary repair of the windlass gear, which is a consequence of the accident. *See* Jason Fernandes Trial Testimony at p. 293-294.

River Ventures claims the failure of the port windlass gear on March 20, 2018 at 2132 hours delayed the starboard anchor replacement. *See* Rec. Doc. 113 at Uncontested Fact 62. ADM was seeking to replace the starboard anchor from the onset and that the port windlass gear temporary repair failed while ADM was in the process of setting up a location and facility to accommodate the repair. *See* Rec. Doc. 113 at Uncontested Fact 59, 60, 63, 64, 65, 66, 67, and 68.

Cheick Savane considered having the repair done while the ship was discharging cargo in the buoys, but the USCG would not approve going in the buoys with just one anchor. He considered doing repairs at Reserve Anchorage and contacted Brent Boeckmann of ARTCO who came to Reserve Anchorage and had a crane barge available, but that plan failed for safety reasons because the ship was yawing too much within the anchorage because of the current and just one anchor. Then, Savane contacted Globalplex and thought he might go there, but the Globalplex shore crane was down so, he contacted ARTCO who moved a crane barge nearby and assessed the situation, but it too was not safe. Globalplex is an east bank berth and ships always berth bow upriver for control in maneuvers, but the shore crane was out of service.

HARVEST MOON needed the starboard anchor replaced. That meant the crane barge had to be large enough to reach over the bow, get an anchor off the dock, and hoist it. The dock also did not extend the full length of the bow. With high river and surges, after looking at it, ARTCO refused that job as well for safety reasons. Savane next tried Buck Kreihs since they had help with the gear, but their dock was occupied by another ship. Finally, Savane settled on Boland Marine who used a shore-based crane at the Poland Avenue Wharf, an east bank dock so the shore crane was logistically placed to do the job safety. *See* Savane Trial Testimony at p. 361-365; and Jason Fernandes Trial Testimony at 327, ln. 8-12.

The gear failure was related to the accident but even if the gear never had a problem at all, it still would have taken until March 24th at 1630 hours to replace the starboard anchor. *See* Exhibit AT-44, Boland Invoice; Exhibit AT-55, Photo of new anchor on Poland Ave. Wharf; Exhibit AT-56, Photo of D-link; Exhibit AT-33; Exhibit AT-42; Savane Trial Testimony at p. 375, ln. 2 to p. 377, ln. 2. When a ship is off hire and other work is done at the same time as repairs due to the accident that does not reduce the recovery as long as the other work did not extend the time it would have taken to conduct collision related repairs. In *Delta Marine Drilling Company v. M/V BAROID RANGER*, 454 F. 2d 128 (5 Cir. 1972, the Court said:

> "Baroid further questions the district court's findings of lost time by arguing that time spent on repairs not caused by the collision should be excluded. There is no merit to this argument. The district court concluded, and we agree, that the non-collision repairs performed here were performed simultaneously with collision repairs and did not extend the time of detention beyond that which was required for collision repairs. In these circumstances a vessel owner may recover for the full detention."

It is important to note the repairs to the starboard anchor were completed on March 24, 2018 and tested and approved before the class surveyor left the ship at 16:30 hours. *See* Exhibit AT-19; Exhibit AT-61, Class NK Travel Notes; and Savane Trial Testimony at p. 375-376.

River Ventures disputes that ADM should recover additional charges during the 6.44 days the ship was off charter including extra expense for pilotage of $147,602.11 (*See* Exhibit AT-36), launch services $27,528 (*See* Exhibit AT-38), Extra Expense–Tug Charges (*See* Exhibit AT-40), and Extra Expense–Launch Services. The replacement starboard anchor was installed, tested, and approved before NKK Class surveyor left the ship on March 24, 2018 at 1630 hours. *See* Exhibit AT-61; and AT-62, Daily Log for Survey Items. The replacement gear did not arrive until the morning of March 25th by 9:21 a.m. with it being installed later that day. *See* Exhibit AT-60, 3/25/2018 E-mail at 9:21 a.m. regarding gear and photos of gear. Also that day, worn port links unrelated to the casualty were replaced from the ship's forecastle/inventory as required by the Class surveyor. *See* Exhibit AT-44, Boland invoice, replacement of links in port chain with vessel furnished spare links. The Class surveyor did not arrive at the ship until 1400 hours on March 25, 2018. *See* Exhibit AT-61. He inspected and approved the new work including testing of the newly manufactured gear and issued his approval report at 1630 hours on March 25th, exactly 24 hours after he left approving the anchor installation. *See* Exhibit AT-61; and Exhibit AT-62. So, if the gear is related to the casualty, the costs are related to the accident but if the Court were to find that the gear breaking on the 20th was not related to the accident, then the claim of ADM would only be reduced by $41,451.78 which represents the total costs in the claim from 1630 hours on March 24th to 1630 hours on March 25, 2018. *See* Savane Trial Testimony at p. 375, ln. 2 to 9. 379, ln. 6.

The downtime does not stop when the NKK Class surveyor issues his report. The report was sent into the USCG at 1632 on March 25th. *See* Exhibit AT-27, Port Log – Statement of Facts by Norton Lilly and HARVEST MOON Master. Then, the USCG released the ship from the last of several restrictions at 1853 hours that day (*See* Exhibit AT-32, 3/25/18 Email from Dylan

Walker, and AT-27), but the ship was at Poland Avenue Wharf at Mile 93. *See* Savane Trial Testimony at p. 372, ln. 11 to p. 373, ln. 8; and Exhibit AT-27 at p. 6. She had come downriver to get a berth to reattach the anchor. She is entitled to recover the downtime and expense to get back to Mile 137 where the accident happened with an ultimate destination of Mile 158. She incurred costs of line handlers and went upriver toward the discharge berth but had to stop at Ama Anchorage, dropping her anchors at 0518 hours on March 26, 2018, waiting on an available load berth. *See* Exhibit AT-27. At this point, lost time and expense stop accruing. Savane Trial Testimony at p. 372, ln. 7 to p. 373, ln. 8

River Ventures argues that tug costs should not be recoverable because they were needed due to loss of the anchor but since the anchor loss was related to the accident, the tugs charges of $400,706.01 are recoverable. River Ventures argues that because some of the Captain of the Port Orders did not specifically require tugs, then tugs were not necessary and should not be recoverable. The tugs were called as heard on the radio and in the transcript moments after the first touching of RANDY W. *See* Exhibit AT-6 at p 16, confirming calls for tugs at 23:36:21, 14 seconds after contact. Tugs were used to stabilize and control the ship because of the current and because she was heavily laden, having just been in an accident before any Captain of the Port Order required tugs. Then tugs were needed from a safety standpoint until the anchor was replaced and the new gear was installed on the 25th of March. *See* Jason Fernandes Trial Testimony at p. 324. The Master is responsible for the safety of his vessel. While the USCG can require tugs until class approval of repairs, the USCG only sets minimum standards. In many instances, such as in this case, the USCG was not fully aware of the risks and dangers and it is up to the Master and pilot to independently evaluate safety which is the reason why the tug charges and pilot charges are recoverable. *See* Jason Fernandes Trial Testimony at 324, ln. 19 to p. 325, ln. 16. Contrary to

the arguments of River Ventures, in *Delta Marine Drilling*, there was no Captain of the Port Order requiring tugs but, the Fifth Circuit approved three tugs for the duration of repairs.

River Ventures argues that it should not have to pay for pilots because pilots would have been needed anyway, but this overlooks the fact that the time in the river under pilotage was extended due to the delay of 6.44 days from the collision. Pilotage was reasonable and necessary and related to the accident.

Uncontested Facts establish that HMO Shipping Co., Ltd. was the owner of HARVEST MOON. *See* Rec. Doc. 113 at Uncontested Fact 5. The ship was chartered to ADM with a $10,000 per day rate. *See* Rec. Doc. 113 at Uncontested Fact 6. The ship went off charter for 6.44 days due to the casualty. *See* Exhibit AT-52, ADM Hire Invoice Debit. During that time, the owner lost hire of $64,458.33. *See* Exhibit AT-52. ADM, as operator, incurred expense during this time which were debited back for the owners account including the charges for tugs of $400,706.01. *See* Exhibit AT-52, Summary of Tug charges; Exhibit AT-3; AT-8, Transcript of radio conversations with updates through 4/10/2018; and AT-39, invoices of Crescent Towing. The ADM debit made the owner pay for off hire bunkers of $7,544.14 and Communication and Victualing of $311.90. The owner also sustained a loss due to bulbous bow damage of $150,000. *See* Jason Fernandes Trial Testimony at p 263, ln. 13-22; and agreement of Kyle Smith, Smith Trial Testimony at p. 634, ln. 16-19. ADM was the owner *pro hac vice* and operator of HARVEST MOON. *See* Rec. Doc. 113 at Uncontested Fact 10. HMO Shipping Co. Ltd. assigned its rights of recovery against River Ventures to ADM, effective the day of the accident. *See* Rec. Doc. 113 at Uncontested Fact 9. The amounts for a new anchor to replace the lost one is recoverable.

The other amounts on the HARVEST MOON Damage Claim (*See* Exhibit AT-106) are related to the accident and fully recoverable with one caveat. The damages include the estimated

cost of retrieval of the anchor, $50,000. While that is a fair cost for retrieval, Weber Marine has issued a report shortly after the accident saying the anchor retrieval is not practical at that time. Twenty-two months have passed since. The USCG required removal, if feasible, and ADM has identified the serial number on the anchor so, if it is found, ADM will have to pay for its retrieval. It is unknown whether it will be found in the future so this is more of a contingent loss (similar to disputed future medicals) and it is not fully clear that the cost of the full removal will be incurred. Otherwise, all items on the far-right column of the HARVEST MOON Damage Claim (*See* Exhibit AT-106) are fully recoverable as casualty-related damages in the claim against River Ventures.

21. **Damages – Tug FREEDOM:**

Kyle Smith never saw HARVEST MOON or its anchor chains. *See* Smith Trial Testimony at p. 622, ln. 8-11. He never went aboard HARVEST MOON. *See* Smith Trial Testimony at p. 621, ln. 19-20. He never examined port or starboard windlass. *See* Smith Trial Testimony at p. 622, ln. 12-14. He does acknowledge the anchor encountered the revetment. *See* Smith Trial Testimony at 627, p. 4-6; and Exhibit AT-33. In his opinion, what the class surveyor says is controlling. *See* Smith Trial Testimony at p. 631, ln. 14-19. He never read the deposition of James Boucher, NKK Class surveyor, but heard the testimony that the chain broke at the D-link. *See* Smith Trial Testimony at p. 623, ln. 16-18. He is unaware of any factual information to suggest otherwise. *See* Smith Trial Testimony at 9. 631, ln. 11-13 and p. 623, ln. 19-24. But he disputes the lost anchor is a consequence of the collision.

River Ventures claims damages of $29,068.43 to FREEDOM. This includes $4,691.40 of undisputed repair cost which is port side damage above the water line which would be recoverable if HARVEST MOON was negligent.

The River Ventures claim also includes $1,992.90 for port propeller repairs pre-existed the accident (*See* Exhibit AT-12), as explained by Garreth Fernandes who examined the propeller blades. *See* Garreth Fernandes Trial Testimony at p. 233-234.

The claim includes drydocking and underwater damage which was not proven. River Ventures should have drydocked FREEDOM to inspect and repair its bent propellers, rudder, and damaged cutlass bearings before the accident. There was a written agreement to invite ADM to joint inspections. *See* Exhibit AT-94. ADM's surveyors were not invited to see FREEDOM on dry dock even though it was on dry dock three times including once in March, once in July, and once since. *See* Garreth Fernandes Trial Testimony at p 229, ln. 1-23. The drydock charge of $2,929.19 from Belle Chasse is not proven to be related to the casualty. A second dry dock charge is included in the estimate of $19,455 of Kyle Smith who presented no photos of his inspection of the underwater damage at trial. The only two photos of the tug relating to damage visible on drydock were photos (*See* Exhibit AT-95; and Exhibit AT-96) which were taken by a crew member and do not show any damage except for the pre-existing port propeller damage. *See* Smith Trial Testimony at p. 644, ln. 8 to p. 645, ln. 10.

No reason was given for not showing photos of underwater damage. It is noted that at the time of the 30(b)(6) Deposition of River Ventures (Exhibit AT-116), two Kody Marine damage invoices were produced, one for $48,320 in repairs done after the accident but not related, plus $48,200 in additional future repairs, both of which Mr. Smith rejected as unrelated to the accident. *See* Smith Trial Testimony at p. 598, ln. 12 to p. 599, ln. 14. With no joint surveys as promised, three dry dockings but not one photo of underwater damage of a 53-year old tug, River Ventures has failed to prove more than $4,691.40 of FREEDOM damage is related to the accident, which represents the top side port repairs, including visor and handrails actually damaged from contact

with HARVEST MOON. This number, $4,691.40, is consistent with the initial contact with RANDY W, which produced a total of $1,300 in physical damages from the allision.

### 22. **No Limitation – Tug FREEDOM:**

Tug FREEDOM claimed benefit of limitation of liability. It is clear that River Ventures knew, or should have known, tug FREEDOM was underpowered. It produced a rooster tail that made it difficult for other tugs to push on its stern. Its horsepower was overstated. *See* Capt. Strouse Trial Testimony at p. 351, ln. 17 to p. 352, ln. 5. It had four bent propeller blades on the port, one bent on the starboard, and over $40,000 in unrepaired damage. It was built in 1966. It was trying to qualify as an inspected vessel for the past three years and still has not been approved. Its owner was aware of bent propellers and never fixed them. *See* Hanna Trial Testimony at p. 164, ln. 9-20.

Jack Leary, River Ventures' Naval Architect, indicates in his report on the eve of trial that with the bent rudder and propellers, the tug was capable only of pushing RANDY W at a speed upstream against the current of between 0.08 knots and 1.08 knots over ground after taking into consideration the unrepaired damage. *See* Leary Trial Testimony at p. 568, ln. 10-16. This expert report confirms a statutory violation of 33 CFR §165.810(3) which says:

> "Towing in any formation by a vessel with insufficient power to permit ready maneuverability and safe handling is prohibited."

No stronger expression of unseaworthiness could exist. At full speed, she was actually unable to push RANDY W over ground at 1 knot. There is privity and knowledge of unseaworthiness which destroys limitation. *See* Hanna Trial Testimony at p. 164, ln. 9-20.

There is no limitation for failure to train. *See Trico Marine Assets v. Diamond B. Marine Servs.*, 332 F.3d 779 (5thCir. 2003) (failure to train as grounds for denial of limitation of liability); *In re Bopco, L.P.*, 2013 U.S. Dist. LEXIS 128991 (E.D. La. 2013); *In re Omega Protein, Inc.*, 548 F.2d 361, 371 ("If the vessel's negligence or seaworthiness is the proximate cause of the claimant's

loss, the plaintiff-in-limitation must prove it had no privity or knowledge of the unseaworthy conditions or negligent act.")

River Ventures hired Tug and Barge Solutions to draft an 1,800-page manual and put it onboard FREEDOM but never gave Capt. Bordes specific training on navigation assessments. *See* 30(b)(6) Deposition of River Ventures (Exhibit AT-116) at p. 82-83. He was not given training on his stop work authority. *See* Deposition of Folan (RV-251) at p. 62. He was not given <u>training on how to use</u> his assist tugs. *See* 30(b)(6) Deposition of River Ventures (Exhibit AT-116) at p. 170, ln. 20 to p. 171, ln. 2. Jerry Hanna, the owner was aware of a near-miss report showing FREEDOM needed a second tug to move a single hopper barge smaller than RANDY W, from the day before the accident. Hanna never told Capt. Bordes. *See* 30(b)(6) Deposition of River Ventures (Exhibit AT-116) at p. 171. Hanna Trial Testimony at p. 171, ln. 1-21; and Exhibit AT-81.

Capt. Bordes works 12-hour days. *See* Hanna Trial Testimony at p. 171. He works 7 days a week and is not paid overtime. *See* Hanna Trial Testimony at p. 171. River Ventures expects him to read the 1,800-page manual without compensating him to read it. *See* Hanna Trial Testimony at p. 171.

River Ventures' owner knew of the bent propeller blades that went back to July, eight months before the accident. *See* Exhibit AT-77; Exhibit AT-78; Exhibit AT-79, and Exhibit AT-80. Reports showed the vibration from the propeller led to the port cutlass bearing falling against the hub months before the accident, but he never fixed it. The starboard rudder was bent, and River Ventures knew it 10 days before the accident, but he did not fix it. To fix it, he would have to put the tug on drydock, stop earning charter hire and pay money for drydocking. River Ventures cannot limit its liability in this case.

The value of FREEDOM is disputed. Kyle Smith valued it at $337,500 in May of 2015. He says as of the day of the accident its value was $275,000. It is decreasing in value each year because it has outlived its useful life. Exhibit Smith Trial Testimony at p. 585, ln. 5. Capt. Strouse concluded the tug has a value of $340,000 as of March 19, 2019 so, its value likely exceeded that amount a year earlier. The Court should not reach the question of the vessel's value because River Ventures cannot limit for an unseaworthy vessel with a failure to train its captain. *Trico Marine Assets*, *supra*; *In Re Bopco, LP, supra*; *In Re Omega Protein, Inc.*, *supra*.

22.     **Conclusion:**

There should be judgment in favor of ADM and against River Ventures for $939,026.34. There should be judgment in favor of Chad Gant, Associated, and Ingram for the amounts stipulated. Limitation sought by River Ventures is denied. The claims by River Ventures for damages is denied.

Respectfully submitted,

SALLEY, HITE, MERCER & RESOR, LLC

*/s/ David M. Flotte*
David M. Flotte, T.A. (#1364)
Marcelle P. Mouledoux (#30339)
Kevin M. Frey (#35133)
365 Canal Street, Suite 1710
New Orleans, LA 70130
Tel.: (504) 566-8800
Fax: (504) 566-8828
dflotte@shrmlaw.com
mmouledoux@shrmlaw.com
kfrey@shmrlaw.com

*Attorneys for ADM International Sarl*

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2020, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all persons electronically noticed.

*/s/ David M. Flotte*