# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ADM INTERNATIONAL SARL | CIVIL ACTION |
| VERSUS | NO. 18-3466 |
| RIVER VENTURES, LLC ET AL. | SECTION "L" (4) |

## I.     INTRODUCTION AND PROCEDURAL POSTURE

This action arises out of a vessel collision that occurred on the Mississippi River mile marker 137 above Head of Passes ("AHP"). The involved vessels include the bulk cargo carrier M/V Harvest Moon ("the Harvest Moon"), the tugboat M/V Freedom ("the Freedom), which was pushing the crane barge C/W Randy W ("the Randy W"), and the tug boat M/V St. Elmo ('the St. Elmo). At all relevant times, ADM International SARL ("ADM") was the charterer and owner *pro hac vice* of the Harvest Moon, River Ventures, LLC ("River Ventures") was the owner and operator of the Freedom, Associated Marine Equipment, LLC ("Associated Marine") was the owner and operator of the Randy W, and Marquette Transportation Company Gulf-Inland, LLC ("Marquette") was the owner and operator of the St. Elmo. Chad Gant was aboard the Randy W during the incident and allegedly sustained injuries as a result. Moreover, after the Freedom, St. Elmo, and Randy W (collectively, "the Flotilla") and the Harvest Moon collided, the Harvest Moon allided with several barges owned by Ingram Barge Company, LLC ("Ingram Barge") and docketed on the left descending bank (East Bank).

In the first-filed action, ADM brought suit against River Ventures, Associated Marine, and Marquette. In reply, Associated Marine filed a counter-claim against ADM and ADM then filed a third-party complaint against River Ventures and Marquette pursuant to Federal Rule of Civil Procedure 14(c). In turn, Marquette filed a cross-claim against River Ventures, and River Ventures

filed a counter-claim against ADM. ADM and Marquette subsequently dismissed all claims against each other in this action, and Marquette dismissed all its claims against River Ventures.

In a second-filed suit, River Ventures filed a Complaint for Exoneration From or Limitation of Liability. ADM, Associated Marine, Chad Gant, and Ingram Barge answered the limitation action and filed their own claims in limitation. Ingram Barge also filed a cross-claim against ADM, leading ADM to file another Rule 14(c) third-party complaint against River Ventures and Marquette. In response, Marquette filed a Rule 14(c) third-party complaint against ADM and a cross-claim against River Ventures, and River Ventures filed a counter-claim against ADM. Subsequently, ADM and Marquette dismissed all claims against each other in this action and Marquette also dismissed all of its claims against River Ventures in this action.

Finally, in a third-filed suit, Associated Marine filed a Complaint, asserting damages in rem against the Harvest Moon. ADM answered on behalf of the Harvest Moon and filed another Rule 14(c) third-party complaint against River Ventures and Marquette. River Ventures filed a counter-claim against ADM and a cross-claim against the Harvest Moon. Marquette filed a cross-claim against River Ventures. Subsequently, ADM and Marquette dismissed all claims against each other in this action and Marquette also dismissed all of its claims in this action.

All three of the above-described actions were consolidated under the first-filed case number of 18-3466. ADM and Marquette have dismissed all their claims against each other, and Marquette has dismissed all its claims against River Ventures. Moreover, ADM's claims against Associated Marine were also dismissed. Finally, the damages owed to Chad Gant, Ingram Barge, and Associated Marine have been stipulated to by ADM and River Ventures, so the only remaining aspects of these claims that were tried were the percentage fault assigned to ADM and/or River Ventures for the incident and the amount of the damages they each sustained.

ADM claims that the Freedom violated River Ventures' Towing Safety Management System ("TSMS"), which led to the collision in question. Specifically, ADM alleges that the Freedom violated the TSMS stop-work authority and navigational assessment provisions, as well as the Coast Guard's Navigation Rules, which put the Flotilla and Harvest Moon at risk of collision and created a condition that directly led to the collision. ADM thus contends it is entitled to recover all of its damages resulting from this accident and should not be held liable for any damages sustained by any of the other parties.

In answer, River Ventures alleges that the vessel collision and subsequent allision was caused solely by the Harvest Moon. Specifically, River Ventures contends that the Harvest Moon was unable to anchor properly due to her speed and swung well outside the designated boundaries of the Reserve Anchorage, and she collided with the Flotilla and then proceeded to allide with the barges owned by Ingram Barge. River Ventures thus argues that ADM's negligence and the Harvest Moon's unseaworthiness were the sole causes of the incident.

This matter came before the Court without a jury on December 2, 2019 and concluded on December 4, 2019. The Court has carefully considered the testimony of all the witnesses, the exhibits entered into evidence during trial, and the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law. To the extent that any findings of fact may be construed as conclusions of law, the Court adopts them as such. To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

## II.     FINDINGS OF FACT

1.  The Harvest Moon is a deep draft cargo ship approximately 225 meters by 32 meters that sails under the flag of the Marshall Islands. At all relevant times, ADM was the charterer,

operator, and owner *pro hac vice* of the Harvest Moon. R. Doc. 1 at 1.

2. At all relevant times, the Harvest Moon was under the direction of a compulsory pilot, Ted Davisson ("Pilot Davisson"). R. Doc. 113 at 21. At all relevant times, Captain Raman remained in the wheelhouse of the Harvest Moon with Pilot Davisson.

3. River Ventures was and is the owner and operator of the Freedom. R. Doc. 113 at 21; R.V. Tr. Ex. 234.

4. At all relevant times, Captain Peter Bordes, IV ("Captain Bordes") and deckhands Tony Porche and Josh Miller were the crew on board the Freedom. R. Doc. 113 at 21.

5. At all relevant times, Marquette was the owner and operator of the St. Elmo and the M/V ST. RITA ("St. Rita"), with Matthew Faulkner and Glynn Bonnet on board the vessels as captains, respectively. R. Doc. 113 at 22.

6. At all relevant times, Associated Marine was the owner and operator of the Randy W, which was crewed by multiple seamen including Chad Gant. R. Doc. 113 at 21.

7. At all relevant times, the Harvest Moon, Freedom, St. Rita, and St. Elmo participated in the automatic identification system ("AIS"), an automatic tracking system that uses transponders on ships and is used by vessel traffic services to determine the location of vessels on the River. R.V. Tr. Ex. 239; R.V. Tr. Ex. 240–242; Tr. Ex. AT-3.

8. After the incident, forensic data was recovered from the voyage data recorder ("VDR") and Electronic Chart Display and Information System ("ECDIS") aboard the Harvest Moon, Rose Point electronic charting from the Pilot aboard the Harvest Moon and from the St. Elmo, and VTS recordings from the United States Coast Guard ("USCG"). The VDR includes bridge voice recordings, radar screenshots, and navigational instrument readings from the Harvest Moon. Moreover, other systems, including the Mississippi River Transit

Information System ("MRTIS"), draw upon these data sources and allow users to look back in time at events. *See* R.V. Tr. Ex. 237; Tr. Ex. AT-11. These sources of electronic data are consistent with proven industry standards, corroborate each other, and are reliable. Tr. at 200:10–200:23, 460:19–461:1, 659:11–661:2. In real time, these systems allowed the crews of the respective vessels to know the location of each other, to contact each other, and understand the movements of each other. The electronic data from these sources document the movements of these involved vessels during the relevant times as follows.

9. On February 26, 2018, the Harvest Moon left Peru with a load of bulk rock phosphate fertilizer. The cargo was to be discharged at the St. James Buoys located at mile marker 158 AHP. R. Doc. 113 at 7, 23.

10. On March 9, 2018, the Harvest Moon was anchored at the Southwest Pass, at approximate position 28°52'42" N, 89°25'54" W, waiting to enter the Mississippi River. R. Doc. 113 at 22.

11. Between March 9 and March 14, 2018, the Harvest Moon remained at anchor due to a shortage of berths along the River. R. Doc. 113 at 22.

12. On March 14, 2018, when the Harvest Moon attempted to heave her anchors in order to move to a different berth, the port anchor brake slipped, bending a stopper pin and the port windlass gear broke. R. Doc. 113 at 22; R.V. Tr. Ex. 1 at 3. The bow stopper was bent and had to be straightened before it could be put back in place; some of the brake liner came out of place; and the anchor stopper had an indentation. R.V. Tr. Ex. 1 at 4.

13. A local ship repair facility, Buck Kreihs Marine Repair, LL ("Buck Kreihs") was called in to conduct temporary repairs. R. Doc. 113 at 22.

14. Notwithstanding the fact that the port gear was rusted and worn, Buck Kreihs was able to

weld the broken teeth back on the gear and the gear was returned to the vessel and installed by the crew on March 15, 2018. R.V. 38; *see* R. Doc. 113 at 22.

15. Buck Kreihs warned ADM that the repairs were only enough to operate the anchor windlass on a short-term basis, and that the gear would have to be replaced to effect a permanent fix. R.V. Tr. Ex. 253 at 14:1–14:11.

16. ADM was aware that the repairs were temporary and had already ordered a newly fabricated port gear from China, which was expected to arrive within a few days. R.V. Tr. Ex. 44 at 1; R.V. Tr. Ex. 76; R.V. Tr. Ex. 255 at 48:15–48:24, 68:13–68:25. The permanent repairs were to be performed when the Harvest Moon arrived at the discharge buoy. R.V. Tr. Ex. 35 at 1.

17. On March 17, 2018, the Harvest Moon proceeded up river and anchored at Belle Chasse Anchorage between mile markers 73.1 and 75.2 on the lower Mississippi River. *See* R.V. Tr. Ex. 21 at 3.

18. The Harvest Moon left Belle Chasse on the morning of March 19, 2018 and continued upriver, intending to stop at the Reserve Anchorage at mile marker 137 to await daylight if necessary. R.V. Tr. Ex. 49 at 1; R.V. Tr. Ex. 50 at 1.

19. On March 19, 2018, the Mississippi River Carrolton Gauge was at 16.95 feet, with a strong current of about 5 knots. R. Doc. 113 at 23; R.V. Tr. Ex. 245 at 50:2–50:10.

20. At or about 16:45 on March 19, 2018, Pilot Davisson boarded the Harvest Moon at Bonnet Carre at mile marker 128 and assumed pilotage of the Harvest Moon. R. Doc. 113 at 23.

21. Pilot Davisson had a brief exchange with Captain Raman and the prior pilot aboard the Harvest Moon before Pilot Davisson assumed pilotage of the Harvest Moon. Tr. at 15:7–15:17. During this exchange, Pilot Davisson was not advised of the temporary repairs to

the port anchor windlass gear. R. Doc. 113 at 23.

22. At or about 18:00 to 18:05 on March 19, 2018, Pilot Davisson advised Captain Raman of his intent to anchor in the Reserve Anchorage at mile marker 137 by dropping her port anchor first, then swinging outside the anchorage, and then dropping her starboard anchor to get a "wide spread" before drifting back into the Anchorage. Tr. at 21:24–22:25; Tr. Ex. AT-7 at 2 (ADM-HM 003331).

23. At 18:06, Pilot Davisson relayed on the radio that the Harvest Moon would be anchoring in the Reserve Anchorage. Tr. Ex. AT-7 at 3 (ADM-HM 003332).

24. Captain Bordes on the Freedom did not hear Pilot Davisson's transmission because he was not yet on the commercial traffic channel. Tr. at 122:17–122: 20, 123:1–126:8.

25. At or about 18:10 to 18:19 on March 19, 2018, the Freedom made up to the Randy W, positioned at a dock aft of the Reserve Anchorage. R. Doc. 113 at 23.

26. By 18:20, the Flotilla, consisting of the Freedom, Randy W, and St. Elmo, started moving along the west bank of the Mississippi River, intending to pass through the Reserve Anchorage and then head upriver, toward the moored OCEAN OPAL ("Ocean Opal"), where it intended to perform services.

27. When the Flotilla pulled away from the dock, Captain Bordes determined that the Harvest Moon was approaching the Reserve Anchorage, so he called out on the radio to ascertain the Harvest Moon's intentions. Tr. at 124:8–124:17, 128:1–129:19; R.V. Tr. Ex. 27 at 1.

28. At or about 18:20:47, the following conversation occurred between Pilot Davisson and Captain Bordes:

> 23:20:34 - Freedom: Freedom to that Harvest Moon
> 23:20:42 - Pilot: Seven 0 on the Harvest Moon
> 23:20:46 - Freedom: Hey buddy you going coming into the anchorage right here

pal?
23:20:47 - Pilot: Well yeah
23:20:52 - Freedom: You said you are sir?
23:20:54 - Pilot: Yes sir I put it out on the air
23:21:04 - Freedom: Alright (inaudible) Randy W I'm trying to get over on the other side of that other ship
23:21:05 - noise followed by Pilot saying "Okay."

R. Doc. 113 at 23–24; see also Tr. at 128:25–130:7.

29. By 18:29, the Flotilla was ahead of the Harvest Moon when it crossed through the Reserve Anchorage and continued toward mid-river, intending to proceed upriver to the starboard side of the Ocean Opal, which was located forward of the Reserve Anchorage. R. Doc. 113 at 24.

30. After this exchange between the Freedom and Harvest Moon, more than ten minutes passed without further communication between the two vessels. *See* R.V. Tr. Ex. 26; R.V. Tr. Ex. 27 at 1–2; Tr. at 71:5–71:10; R.V. Tr. Ex. 27 at 1–2.

31. From 18:21:05 to 18:31:05, Pilot Davisson's interactions with the bridge crew of the Harvest Moon were recorded, but at no time over that span was any concern or alarm sounded about the operation of the Freedom or any other vessels in the vicinity. *See* R.V. Tr. Ex. 26; R.V. Tr. Ex. 27.

32. By 18:28:26, the Harvest Moon's speed over ground had slowed to 0.9 knots and Pilot Davisson ordered "full ahead." *See* R.V. Tr. Ex. 24 at 13–14; R.V. Tr. Ex. 135 at 24.

33. At 18:30:36, Pilot Davisson gave the "half speed" order. R.V. Tr. Ex. 135 at 25.

34. At 18:31:10, Pilot Davisson gave the hard-starboard rudder command, which was confirmed at 18:31:12 and carried out by 18:31:26. The rudder stayed at hard-starboard until 18:33:16. R.V. Tr. Ex. 27 at 1–3 ; R.V. Tr. Ex. 135 at 26–28.

35. At 18:31:34, Pilot Davisson ordered "Let go port anchor." R. Doc. 113 at 24; R.V. Tr. Ex.

135 at 26. At this time, the Harvest Moon's speed had increased to 1.3 knots. R.V. Tr. Ex. 134 at 09:35, 12:42; *see* Tr. at 72:8–72:11 (Day 1); R.V. Tr. Ex. 237 at 8.

36. At 18:32:00, Pilot Davisson asked "Did port anchor go down?" Just after this, the port anchor was heard on the bridge audio, going down. R.V. Tr. Ex. 135 at 26; R.V. Tr. Ex. 134 at 12:43–13:14.

37. Dropping the port anchor, combined with the over two minute hard-starboard rudder command, caused the Harvest Moon to swing starboard, out of the Anchorage and toward the center of the river, where the Flotilla was located. Tr. at 445:13–446:24, 453:17–453:21, 455:4–455:6; R.V. Tr. Ex. 135 at 15.

38. At 18:32:35 with the Harvest Moon's speed increasing 2.1 knots, Pilot Davisson contacted the Freedom, asking if the Flotilla was clear. R.V. Tr. Ex. 134, at 13:38–13:53; *see* R.V. Tr. Ex. 27 at 2–3, R.V. Tr. Ex. 135 at 26–27. The conversation between Pilot Davisson and Captain Bordes was as follows:

> Pilot: Seven-O to the Freedom or St. Elmo
> FREEDOM: Yeah come in for the Freedom
> Pilot: Yeah we just dropped the port anchor, are you above me?
> FREEDOM: Yes sir I'm actually on the outside of you pushing a crane barge
> Pilot: Ok you're not the boat with the derrick?
> FREEDOM: Uh yes, I've got the Randy W that's correct.
> Pilot: Oh okay well I'm swinging out toward you. I would come ahead on that thing.
> FREEDOM: Dude I'm hooked up man
> Pilot: (to Third Officer): Stop engine
> Third Officer: Stop engine sir
> Pilot: Well I would cross over then *(meaning crossing over to the left descending bank)*
> Third Officer: Engine is stopped.
> FREEDOM: Dude, I've got to go to the ship man
> Pilot: Well Captain, do you want to get run over?
> FREEDOM: Not really but I mean… I'll widen out for you buddy…

Tr. Ex. AT-6 at 9–11; *see* R.V. Tr. Ex. 27 at 2–3.

9

39. After crossing the bow of the Harvest Moon, the Flotilla had turned up river but struggled to maintain speed. When Captain Bordes said "I'm hooked up man," he meant that the Freedom was at full throttle, but even at full throttle, the Freedom was only moving at about 0.7 to 0.8 knots. Tr. Ex. AT-75; *see* Tr. Ex. AT-3.

40. After his exchange with Captain Bordes, Pilot Davisson was advised at 18:33:40 that the Harvest Moon was still clear of the Flotilla. R.V. Tr. Ex. 135 at 28.

41. However, by 18:34:09, the Harvest Moon's speed over ground was at 1.9 knots and the vessel had begun to swing rapidly to starboard in the direction of the Flotilla. R.V. Tr. Ex. 24 at 27; *see* R.V. Tr. Ex. 135 at 9.

42. At 18:34:10, Pilot Davisson was warned that the Flotilla might not be clear of the Harvest Moon. R.V. Tr. Ex. 135 at 28.

43. At 18:34:12, Pilot Davisson ordered "full astern" and called for the danger whistle on the Harvest Moon. R. Doc. 113 at 24; R.V. Tr. Ex. 135 at 28; R.V. Tr. Ex. 26.

44. At 18:34:23, Pilot Davisson ordered "Hold port anchor," but by this time, the Harvest Moon had traveled approximately 500 feet past her anchor position. R.V. Tr. Ex. 135 at 12–13; *see also* R.V. Tr. Ex. 135 at 16.

45. Although Captain Bordes had agreed to widen out for the Harvest Moon, *see* Tr. Ex. AT-6 at 11, the Freedom did not do so, *see* Tr. Ex. AT-1; Tr. Ex. AT-4; Tr. Ex. AT-11 at 6–7.

46. Because the Harvest Moon was moving faster than the Flotilla (about 1.9 knots for the Harvest Moon versus about 0.7 knots for the Flotilla), at or about 18:34:39, the Harvest Moon was rapidly closing in on the Ocean Opal and swung outward into the channel toward the Flotilla. R.V. Tr. Ex. 134 at 15:47; R.V. Tr. Ex. 24 at 30–31; Tr. Ex. AT-75.

47. As the Harvest Moon began to move toward the center of the Mississippi River to avoid

colliding with the Ocean Opal, the current caught the bow of the Harvest Moon and pushed her further toward the center of the river and toward the east bank. *See* R.V. Tr. Ex. 24; R.V. Tr. Ex. 237; *see also* Tr. at 520:2–520:6.

48. As this was happening, the St. Elmo pulled away from the Flotilla and managed to avoid the collision. R.V. Tr. Ex. 193.

49. The St. Rita, meanwhile, was docked ashore nearby and uninvolved with the collision as well. Tr. 513:9–514:5.

50. At 18:34:57, Pilot Davisson again asked if the Harvest Moon was clear of the Flotilla, but he was advised the Harvest Moon was not. R.V. Tr. Ex. 135 at 29.

51. At 18:35:22, Pilot Davisson expressed concern about whether the Harvest Moon had struck the Flotilla. R.V. Tr. Ex. 135 at 29.

52. At or about 18:36, the Harvest Moon's starboard side collided with the Randy W's port side. The Harvest Moon also collided with the Freedom's port side. R. Doc. 113 at 24.

53. This collision occurred near mid-river several hundred feet outside the Reserve Anchorage. R.V. Tr. Ex. 7 at 2; R.V. Tr. Ex. 134 at 17:21.

54. After the collision, the Harvest Moon's port anchor chain became entangled in the Randy W's timberhead. Tr. at 526:20–527:4, 528:7–529:12; R.V. Tr. Ex. 261; *see* R.V. Tr. Ex. 144; *see also* R.V. Tr. Ex. 250 at 151:1–152:21, 153:3–153:17.

55. Chad Gant, who was aboard the Randy W, was injured during the collision. R. Doc. 113 at 24; R. Doc. 36.

56. After the Harvest Moon collided with the Flotilla, she remained subject to the strong river current. Tr. at 520:2–520:10; *see also* R.V. Tr. Ex. 134 at 17:48–21:06.

57. At 18:37, the Harvest Moon dropped her starboard anchor in the middle of the channel, but

she was unable to stop. R. Doc. 113 at 24.

58. By 18:40, the Harvest Moon continued traveling across the channel and her bow allided with several barges owned by Ingram Barge that were located on the left descending bank (East Bank). R. Doc. 113 at 24. Several of these barges were damaged as a result of these allisions.

59. At or about 18:46, the Harvest Moon successfully heaved her starboard anchor. R. Doc. 113 at 24.

60. Between 19:44 and 19:52, with the assistance of "Good Samaritan" tugs, the Harvest Moon was able to successfully re-position herself in the Reserve Anchorage and let go both starboard and port anchors. R. Doc. 113 at 24.

61. At 20:06, a new NOBRA pilot boarded the Harvest Moon and decided to shift the position of the vessel. After both port and starboard anchors were ordered to be heaved, the starboard chain was sighted at 20:38 with no anchor. R. Doc. 113 at 24.

62. Meanwhile, on March 19, 2018 at 20:45, after the collision and subsequent allisions, the USCG issued Captain of the Port ("COPT") Order 0227-18 that restricted the Harvest Moon to mile marker 137 until she passed a class survey and had her tanks sounded for leaks. R. Doc. 113 at 24.

63. On March 20, 2018, at or about 02:42, the USCG issued COPT Order 0280-18 imposing additional requirements on the Harvest Moon because she had lost her starboard anchor. R. Doc. 113 at 24–25.

64. Subsequently, by 13:56 on March 20, 2018, the USCG cleared the Harvest Moon from the restrictions of the post-collision COPT Order 0277-18. R. Doc. 113 at 24.

65. At or about 20:56 on March 20, 2018, the Harvest Moon began to heave her port anchor,

but the port windlass gear—which had previously been temporarily repaired—broke at 21:32. R. Doc. 113 at 25.

66. After several days of delays because of the lack of starboard anchor and broken port windlass gear, the Harvest Moon was finally able to depart the Reserve Anchorage at or about 15:20 on March 23, 2018 and arrived at the Poland Street Wharf at mile marker 93 at or about 19:44. R. Doc. 113 at 25.

67. Repairs were then conducted from March 23, 2018 to March 25, 2018, with a new starboard anchor and port windlass gear installed. R. Doc. 113 at 26.

68. ADM makes various claims for damages. The Court will consider each one in turn. As a preliminary matter, however, the Court notes that a vast majority of ADM's claimed damages are due to the lost starboard anchor and need for a replacement port gear, which were not a result of the collision and therefore cannot be recovered. *See* Tr. at 241:1– 241:12, 606:16–606:22, 610:6–610:9, 693:3–693:6. With respect to the starboard anchor, multiple witnesses testified that there was no evidence of any contact between the Flotilla and the Harvest Moon's starboard anchor during the collision. *See* Tr. at 241:1–241:12, 693:3–693:6; R.V. Tr. Ex. 245 at 321:22–321:24. With respect to the port gear replacement, as discussed earlier, Buck Kreihs conducted only temporary repairs and warned ADM that the gear would have to be replaced to effect a permanent fix. R.V. Tr. Ex. 253 at 14:1–14:11. Therefore, the Court finds that the replacement of the port gear was needed prior to the collision and was not caused by the collision.

69. The parties have also stipulated to the following amounts of damages to the following parties: (1) $189,872.80 in damages to Ingram Barge, inclusive of any pre-judgment interest and costs; (2) $73,022.70 in damages to Associated Marine, inclusive of any pre-

judgment interest and costs; and (3) 345,000.00 in damages to Chad Gant, inclusive of any

pre-judgment interest and costs. R. Docs. 113 at 20–21, 123.

### III.    CONCLUSIONS OF LAW

1.  The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1333 and Federal Rule of

    Civil Procedure 9(h). Venue is proper in the Eastern District of Louisiana. Jurisdiction and

    venue are not contested by the parties. The substantive law that governs this case is the

    general maritime law.

2.  The Inland Navigation Rules govern the conduct of the vessels navigating in this portion

    of the Mississippi River. 33 C.F.R. § 83.01 *et seq*.

3.  "The applicable standards of care in a collision case stem from the traditional concepts of

    prudent seamanship and reasonable care, statutory and regulatory rules, and recognized

    customs and uses." *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 364

    (5th Cir. 2006).

4.  "Establishing liability in a collision case is eased by the *Pennsylvania* rule, which provides

    that when a vessel is in violation of a statutory duty, the burden is on the offending vessel

    to prove that its conduct did not and could not have caused the collision." *Id.* (citing *The

    Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873)).

5.  "Where both parties to a collision are in violation of statutes designed to prevent collisions,

    the court may apportion fault between the parties, unless either party proves that its

    statutory violation was not a substantial contributing cause of the collision." *Id.*

6.  "Even without a statutory violation, liability may be imposed simply where there is

    negligence." *Id.*

7.  "[N]egligence is an actionable wrong under general maritime law," and the elements of

that tort are "essentially the same as land-based negligence under the common law." *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010) (citing *Withhart v. Otto Candies, L.L.C.,* 431 F.3d 840, 842 (5th Cir. 2005)).

8. The standard for negligence under general maritime law requires that the "plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by plaintiff, and a causal connection between defendant's conduct and the plaintiff's injury." *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991) (internal citation omitted). Moreover, "the resultant harm must be reasonably foreseeable." *Id.* (citing *Daigle v. Point Landing, Inc.,* 616 F.2d 825, 827 (5th Cir. 1980)).

9. In this case, a vessel anchoring outside the statutorily-defined limits of an anchorage is an appropriate fact-pattern under which to apply the *Pennsylvania* Rule, to presume the breaching vessel is the proximate cause of the incident, and to shift the burden to the offending vessel to show it could not have been at fault. *N.D. Shipping, S.A. v. ZAGORA M/V*, 2009 WL 1606877, at *6–7 (E.D. La. June 5, 2009).

10. At all times that Pilot Davisson was aboard the Harvest Moon, Captain Raman had the authority to override Pilot Davisson's commands or to issue those commands that Pilot Davisson had failed to give. The presence of a pilot does not free the Captain of all obligations regarding the vessel's safety. *Osprey Ship Mgmt., Inc. v. Foster*, 387 F.App'x 425, 433 (5th Cir. 2010) (citing *Avondale v. Int'l Marine Carriers, Inc.,* 15 F.3d 489, 492–93 (5th Cir. 1994); *see also The Oregon*, 158 U.S. 186, 195 (1895) (internal citation and quotation omitted) ("[I]n well-conducted ships the master does not regard the presence of a duly-licensed pilot in compulsory pilot waters as freeing him from every obligation to attend to the safety of the vessel; but that, while the master sees that his officers and crew

duly attend to the pilot's orders, he himself is bound to keep a vigilant eye on the navigation of the [vessel], and, when exceptional circumstances exist, not only to urge upon the pilot to use every precaution, but to insist upon such being taken."). Accordingly, any acts or omissions of Pilot Davisson while piloting the Harvest Moon are imputed to ADM.

11. When Pilot Davisson attempted to drop the anchor of the Harvest Moon outside the Reserve Anchorage, he violated 33 C.F.R. § 110.195(a)(24) and (c)(1). Moreover, the Harvest Moon swinging into the channel to drop her anchor was a violation of Rule 9, which requires vessels to keep to the outer limit of a narrow channel as far as practical, which the Harvest Moon failed to do. *See* 33 C.F.R. § 83.09; R.V. Tr. Ex. 133 at 17.

12. Pilot Davisson's breach of these regulations led to the Harvest Moon colliding with the Freedom and Randy W, which thus triggers the *Pennsylvania* Rule. Accordingly, this shifts the burden of proof to ADM to prove that it could not have been at fault.

13. Meanwhile, the Freedom violated 33 CFR §165.810(3), which states that "[t]owing in any formation by a vessel with insufficient power to permit ready maneuverability and safe handling is prohibited." Even at full speed, the Freedom was barely able to travel over ground at 1 knot and this contributed to the vessel's inability to move out of the way when the Harvest Moon lost control in the strong current outside the anchorage.

14. Despite the above findings, it is important to note that rebuttable presumptions such as the *Pennsylvania* rule serve only to permit the trier of fact, "in the absence of other evidence, . . . [to] have a solid, perhaps as a practical matter an unshakable, basis" to determine whether a party was negligent or whether the party's actions proximately caused an accident. *Rodi Yachts, Inc. v. National Marine, Inc.,* 984 F.2d 880, 887 (7th Cir. 1993). These presumptions, however, have limited applicability in the instant case because

"there *is* other evidence." *Id.* (emphasis added). As the Fifth Circuit has explained, "[e]videntiary presumptions . . . are designed to fill a factual vacuum. Once evidence is presented . . . presumptions become superfluous because the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions." *See In Re Mid–S. Towing Co.,* 418 F.3d at 531 (quoting *Rodi Yachts, Inc.,* 984 F.2d at 887).

15. Having reviewed the witnesses' testimony, the exhibits admitted into evidence, and the parties' briefing, the Court finds that, even in the absence of the above presumptions, the Harvest Moon was negligent, and her negligence was a proximate cause of the collision and subsequent allisions. The Harvest Moon had a temporarily repaired port windlass that needed to be permanently replaced, which the Pilot should have been aware of and considered while maneuvering the vessel. Moreover, the Harvest Moon was traveling at a high speed as she tried to drop her anchor, which led to the vessel veering outside of the anchorage and being caught up in the strong current outside of the statutorily-defined Reserve Anchorage. These acts and omissions then led to the Harvest Moon colliding with the Flotilla, which failed to move out of the way in time, and then subsequently alliding with the Ingram Barges on the left descending bank (Easter River).

16. The Court also finds, however, that the Freedom's slow speed and failure to widen out for the Harvest Moon also contributed to and was a proximate cause of the accident. Had the Freedom not slowed down significantly and widened out as she had agreed to, the **Harvest Moon, despite her earlier negligence, would likely have been able to avoid colliding with the Flotilla.**

17. In maritime tort cases where more than one party is responsible, courts apportion liability on the basis of fault according to the rules of comparative negligence. *United States v.*

*Reliable Transfer Co.,* 421 U.S. 397, 411 (1975). Accordingly, this Court will apply the rule of comparative negligence in determining the allocation of liability for damages between ADM and River Ventures in this case.

18. As between the two vessels in this case, the Court finds that the Harvest Moon bears the far greater apportionment of fault. The collision and subsequent allisions could have easily been prevented if the Harvest Moon had simply slowed and remained in the Reserve Anchorage boundary while dropping her anchor as she should have, rather than swinging wide out into mid-river, being caught in the strong current, and losing control of her ability to maneuver.

19. The Court also notes, however, that the Freedom did not have enough power in the strong current to move out of the way and she did not widen out after expressly agreeing to do with the Harvest Moon. If the Harvest Moon and the Flotilla had not collided, it is possible that the Harvest Moon might not have spun out of the control as she did and allide with the Ingram Barges. Therefore, the Court concludes that the collision led to the subsequent allisions on the left descending bank (East Bank).

20. As explained above, the crew and pilot of the Harvest Moon not only violated several statutory regulations, but they also breached several duties owed to the vessels and persons around the Harvest Moon, including, in relevant part, River Ventures, Chad Gant, Ingram Barge, and Associated Marine. This breach caused injuries and damages to River Ventures, Chad Gant, Ingram Barge, and Associated Marine. Therefore, ADM was negligent and is liable to these entities and people for a certain percentage of their damages.

21. Additionally, the crew and captain of the Freedom also breached several duties owed to the vessels and persons around the Freedom, including, in relevant part, ADM, Chad Gant,

Ingram Barge, and Associated Marine. Therefore, the Freedom was negligent and is liable to these entities and people for a certain percentage of their damages.

22. The Court finds that ADM's apportionment of fault is 80 percent and River Ventures apportionment of fault is 20 percent. Based on this allocation, the Court will calculate the damages owed to each party.

23. Of the $189,872.80 in damages, inclusive of pre-judgment interest and costs, incurred by Ingram Barge in this matter, Ingram Barge is entitled to recover $151,898.24 from ADM and $37,974.56 from River Ventures.

24. Of the $73,022.70 in damages, inclusive of pre-judgment interest and costs, incurred by Associated Marine in this matter, Associated Marine is entitled to recover $58,418.16 from ADM and $14,604.54 from River Ventures.

25. Of the $345,000.00 in damages, inclusive of pre-judgment interest and costs, incurred by Chad Gant in this matter, Chad Gant is entitled to recover $276,000 from ADM and $69,000 from River Ventures. Based on the pre-trial settlement terms, since $60,000 of Chad Gant's damages was already been funded by ADM and/or its insurer and another $60,000 was funded by River Ventures and/or its insurer, Chad Gant is only entitled to $225,000 new money as a result of this Judgment. Of this $225,000, ADM owes $216,000 and River Ventures owes $9,000.

26. No party is liable to Marquette for any amount, and any of its claims which were previously dismissed without prejudice are now dismissed with prejudice.

27. With respect to the Harvest Moon's claimed damages, the Court concludes that only certain damages can be attributed to the instant collision and those are the only damages that are recoverable. As discussed earlier, the Harvest Moon's lost starboard anchor and need for a

replacement port gear are not a result of the collision. Therefore, ADM cannot recover for damages related to these two issues. The breakdown is as follows.

28. ADM's claim for pilotage fees from March 19, 2018 to March 25, 2018 is mostly not recoverable. The Harvest Moon was required to have a pilot onboard for safety while at the Reserve Anchorage and until she was cleared to shift to the St. Janes Buoys, her ultimate destination. R.V. Tr. Ex. 29 at 1, 30 at 1, 31 at 1, 32 at 1, 33 at 1, 43 at 1, 46 at 1, 47 at 1, 48 at 1, 49 at 1, 50 at 1; *see also* R.V. Tr. Ex. 133 at 13. The only time frame that the Harvest Moon needed to remain in the Reserve Anchorage with a pilot that can be attributed to the collision is until March 20, 2018 at 13:56 when the USCG post-collision COPT 0277-18 was cleared. After that, until March 25, 2018, the Harvest Moon remained unable to resume her journey to her final destination and required extra pilotage because of her issues with her port gear and lost starboard anchor, neither of which were the result of the collision. The extra pilotage fees that are attributable to the collision is $20,236.68. R.V. Tr. Ex. 221 at 1–2.

29. Similarly, although ADM seeks recovery for tug charges and launch services from March 19, 2018 to March 25, 2018, most of these expenses are not recoverable for the same reasons listed for the extra pilotage expenses. Specifically, the only tug and launch service expenses that are associated with the collision are the expenses accrued until the post-collision COPT 0277-18 was cleared at or about 13:56 on March 20, 2018. The extra tug and launch services charges that are attributable to the collision is $47,306.29, or $39,593.09 (tug charges) plus $7,713.20 (launch services). R.V. Tr. Ex. 221 at 4–5, 8–10.

30. Because the loss of the starboard anchor was not the result of the collision, ADM cannot recover for the new anchor and freight. Similarly, because the claimed costs for cranes,

berthing, security, harbor fees, and labor costs are related to the replacement of the starboard anchor, the costs are not attributable to the collision and are not recoverable.

31. Of ADM's $2,207.86 claim for the FML superintendent travel expense after the collision, only $2,137.50 is related to the collision and therefore recoverable. R.V. Tr. Ex. 221 at 14.

32. ADM's claim for VDR retrieval after the collision is a cost of litigation rather than related to damages to the Harvest Moon, and so it is not recoverable as damages.

33. ADM claims $150,000 in damages for estimated repairs to the bulbous bow of the Harvest Moon after the collision. Both Jason Fernandes and Kyle Smith, expert marine surveyors, testified that this estimate for repairs is correct. Tr. at 263:13–263:22, 634:13–634:21. Therefore, the Court concludes that $150,000 in damages for the bulbous bow repair is attributable to the collision and recoverable.

34. ADM claims $50,000 in damages for the estimated cost of retrieval of the starboard anchor. However, because the Court concludes that the loss of the starboard anchor is not related to the collision, this amount is not recoverable.

35. ADM's claim for marine surveyor fees is only recoverable for those costs associated with the collision. Any survey costs that are related to the starboard anchor or litigation preparation are not recoverable as damages. Therefore, the amount of ADM's marine surveyor fees that can be recovered is $14,348.00. R.V. Tr. Ex. 221 at 19.

36. ADM's claim for class survey fees is only recoverable for the inspection done to determine the potential damage to the vessel after the collision. Any fees relating to the replacement of the starboard anchor, repair of the port windlass bear, and other items are not recoverable as damages. Therefore, the amount of damages recoverable for class survey fees is $1,266.00. R.V. Tr. Ex. 221 at 20–21.

37. ADM has a claim for loss of hire beginning on the morning of March 19, 2018 through the evening of March 25, 2018. However, only a small time frame in this window is related to the collision—namely, from 18:36 on March 19, 2018 to 13:56 on March 20, 2018. The amount of damages for the loss of hire is therefore $8,055.56. R.V. Tr. Ex. 221 at 22–23.

38. Similarly, although ADM has a claim for bunkers beginning from the morning of March 19, 2018 through the evening of March 25, 2018, only the small window of time is related to the collision. Therefore, the only bunker cost attributable to the collision is $943.42. R.V. Tr. Ex. 221 at 24–25.

39. Likewise, ADM's claim for communication and victualling expenses is only recoverable for the March 19, 2018 at 18:36 to March 20, 2018 at 13:56 time range. The total recoverable damages for this category is $38.98. R.V. Tr. Ex. 221 at 26–27.

40. Finally, ADM claims extra expenses for line handling charges for March 24, 2018 at March 25, 2018, but none of these expenses are related to the collision and are not recoverable.

41. Therefore, ADM's claimed damages that are attributable to the collision and are recoverable are as follows:

| | |
|---|---|
| Extra Pilotage Expenses | $20,236.68 |
| Extra Tug Charge Expenses | $39,593.09 |
| Extra Launch Services Expenses | $7,713.20 |
| Superintendent Travel Expenses | $2,137.50 |
| Bulbous Bow Repair (estimate) | $150,000.00 |
| Marine Surveyor Fees | $14,348.00 |
| Class Survey | $1,266.00 |
| Loss of Hire | $8,055.56 |
| Offhire Bunkers | $943.42 |
| Offhire Communication and Victualling Expenses | $38.98 |
| **TOTAL** | **$244,332.43** |

As discussed earlier, ADM's apportionment of fault for this collision is 80 percent. Therefore, ADM can only recover 20 percent of this total, or $48,866.486, from River

Ventures.

42. Meanwhile, River Ventures makes several claims for damages as well, which the Court concludes are attributable to the collision and are therefore recoverable. The breakdown of these damages are as follows:

| | |
|---|---|
| Port top-site welding work | $2,307.62 |
| Post-collision drydock inspections | $2,929.13 |
| Steel used in top side metal repairs | $415.01 |
| Propeller repair | $1,992.90 |
| Post-incident marine surveys | $1,273.75 |
| Post-incident drug testing | $356.00 |
| Paint and paint supplies | $147.02 |
| Launch service cost for USCG personnel | $192.00 |
| Future repairs to Freedom (estimate) | $19,455.00 |
| **TOTAL** | **$29,068.43** |

As discussed earlier, River Ventures' apportionment of fault for this collision is 20 percent. Therefore, River Ventures can only recover 80 percent of this total, or $23,254.744, from ADM.

43. As a final matter, River Ventures claims the benefit of limitation of liability and attempts to limit its liability to $275,000—the alleged value of the Freedom and her freight on the day of the March 19, 2018 collision. Under the Limitation of Liability Act, a vessel owner may limit its liability for maritime casualties to "the value of the vessel and pending freight." 46 U.S.C. § 30505(a). "However, if the vessel's negligence or unseaworthiness is the proximate cause of the claimant's loss, the plaintiff-in-limitation must prove it had no privity or knowledge of the unseaworthy conditions or negligent acts." *Trico Marine Assets Inc. v. Diamond B Marine Services Inc.*, 332 F.3d 779, 789 (5th Cir. 2003) (*citing Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir. 1993)); *see also* § 30505(b). The Fifth Circuit has stated that "privity or knowledge" "implies some sort of 'complicity in

23

the fault that caused the accident.'" *Brister v. A.W.I., Inc.,* 946 F.2d 350, 355 (5th Cir. 1991) (quoting *Nuccio v. Royal Indem. Co.,* 415 F.2d 228, 229 (5th Cir. 1969)). "A corporate owner is assumed to know what the corporation's managing officers knew or 'should have known with respect to conditions or actions likely to cause the loss.'" *In re Omega Protein, Inc.,* 548 F.3d 361, 371 (5th Cir. 2008) (quoting *Trico Marine Assets,* 332 F.3d at 789–90. "The question of 'privity or knowledge must turn on the facts of the individual case.'" *Brister,* 946 F.2d at 355–56 (quoting *Gibboney v. Wright,* 517 F.2d 1054, 1057 (5th Cir.1975)).

44. In this case, the Court concludes that River Ventures is not entitled to a limitation of liability because Captain Bordes' negligence in not widening out after agreeing to do so and the Freedom's inability to move fast enough in the strong current were contributing factors to the collision. At the very least, River Ventures knew, or should have known, that the Freedom was underpowered and unable to readily maneuver in the strong current, which is a violation of 33 CFR §165.810(3). Therefore River Ventures is not entitled to a limitation of its liability to $275,000 as requested.

45. Because this is an admiralty or maritime case, an award of prejudgment interest on past losses is appropriate. *See, e.g., Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986); *Manson Gulf, L.L.C. v. Lafleur*, No. 18-31071, 2019 WL 4124431, at *3 (5th Cir. Aug. 29, 2019).

## IV.    SUMMARY

As discussed earlier, the damages owed to Chad Gant, Ingram Barge Company, LLC, and Associated Marine Equipment, LLC were stipulated to by ADM International SARL and River Ventures, L.L.C. Accordingly, the only claims that this Court is resolving are the percentage fault

assigned to ADM and/or River Ventures for the incident and the amount of the damages they each sustained. On the basis of the foregoing Findings of Facts and Conclusions of Law, the Court finds that Defendant/Counter-Claimant River Ventures has sustained damages due to Plaintiff/Counter-Defendant ADM's violation of statutory regulations and negligence, and that Plaintiff/Counter-Defendant ADM has also sustained damages due to Defendant/Counter-Claimant River Ventures' negligence. The Court assigns 80 percent of the fault to ADM and 20 percentage of the fault to River Ventures.

Accordingly, ADM and River Ventures are responsible for paying Chad Gant, Ingram Barge Company, LLC, and Associated Marine Equipment, LLC in line with their respective apportionments of fault. Additionally, ADM is entitled to recover 20 percent of its $244,332.43 damages from River Ventures, which comes to $48,866.486, and River Ventures is entitled to recover 80 percent of its $29,068.43 damages from ADM, which comes to $23,254.744. Moreover, the Court awards pre-judgment interest on past damages for ADM and River Ventures at the federal judicial rate from the date of judicial demand until the date of judgment and notes that the stipulations of damages owed to Chad Gant, Ingram Barge Company, LLC, and Associated Marine Equipment, LLC are inclusive of pre-judgment interest. Finally, the Court awards post-judgment interest on the total award amounts at the federal judicial rate from the date of judgment until paid.

New Orleans, Louisiana, on this 28th day of February, 2020.

UNITED STATES DISTRICT JUDGE